S09A1536, S09X1538. HALL v. LANCE; and vice versa.
(687 SE2d 809)

HUNSTEIN, Chief Justice.

A jury convicted Donnie Cleveland Lance of two counts of murder and of related crimes in connection with the deaths of his ex-wife, Sabrina "Joy" Lance, and her boyfriend, Dwight "Butch" Wood, Jr. The jury sentenced Lance to death for each of the murders, and this Court affirmed his convictions and sentences unanimously.

*Lance v. State*, 275 Ga. 11 (560 SE2d 663) (2002). Lance filed a petition for a writ of habeas corpus on May 29, 2003, and he amended the petition on August 25, 2005. After conducting an evidentiary hearing, the habeas court granted the petition with respect to Lance's death sentences and denied the petition with respect to his convictions. The Warden has appealed in Case Number S09A1536, and Lance has cross-appealed in Case Number S09X1538. In the Warden's appeal, we reverse and reinstate Lance's death sentences. In Lance's cross-appeal, we affirm.

## I. *Factual Background*

The evidence at trial showed that Lance had a long history of abusing Joy Lance both before and after they divorced, including kidnapping her, beating her with his fist, a belt, and a handgun, strangling her, electrocuting her with a car battery, and threatening her with a flammable liquid, handguns, and a chainsaw. He had repeatedly threatened to kill her himself, and he had once inquired of a relative about what it might cost to hire someone to kill her and Butch Wood. Lance kicked in the door of Butch Wood's home in 1993 armed with a shotgun, loaded a shell into the chamber of the shotgun, and then fled only after a child in the home identified and spoke to Joe Moore, Lance's friend who was accompanying Lance that night.

Shortly before midnight on November 8, 1997, Lance called Joy Lance's father, asked to speak to her, and learned that she was not at home. Shortly afterward, a passing police officer noticed Lance's automobile leaving his driveway. Lance arrived at Butch Wood's home, kicked in the front door, shot Butch Wood on the front and the back of his body with a shotgun, and then beat Joy Lance to death by repeatedly striking her in the face with the butt of the shotgun, which broke into pieces during the attack. Joy Lance's face was rendered utterly unrecognizable. Later that morning, Lance told his friend, Joe Moore, that Joy Lance (whom Lance referred to in a derogatory manner) would not be coming to clean Lance's house that day; that Butch Wood's father could not "buy him out of Hell"; and that both Joy Lance and Butch Wood were dead. Lance later told a fellow inmate that he "felt stupid" that he had called Joy Lance's father before the murders, and Lance bragged to the inmate that "he hit Joy so hard that one of her eyeballs stuck to the wall."

## II. *Alleged Ineffective Assistance of Counsel*

Lance argued in the habeas court that his trial counsel rendered ineffective assistance in various ways during both the guilt/innocence

phase and the sentencing phase. An ineffective assistance of counsel claim must show that counsel rendered constitutionally-deficient performance and that actual prejudice of constitutional proportions resulted. *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SC 2052, 80 LE2d 674) (1984); *Smith v. Francis*, 253 Ga. 782 (1) (325 SE2d 362) (1985). The constitutional standard for attorney performance is determined with reference to "prevailing professional norms." *Strickland*, supra at 688 (III) (A). See also *Hall v. McPherson*, 284 Ga. 219 (2) (663 SE2d 659) (2008) (noting relevance of published professional guidelines in assessing what might have been reasonable in a particular case). A review of an attorney's performance "includes a context-dependent consideration" of counsel's decisions that sets aside the "'distorting effects of hindsight.'" *Wiggins v. Smith*, 539 U. S. 510, 523 (II) (A) (123 SC 2527, 156 LE2d 471) (2003). To show sufficient prejudice to succeed on an ineffective assistance of counsel claim, a petitioner must demonstrate that

> there is a reasonable probability (i.e., a probability sufficient to undermine confidence in the outcome) that, but for counsel's unprofessional errors, the result of the proceeding would have been different. [Cit.]

*Smith v. Francis*, supra at 783 (1). We accept the habeas court's findings of fact unless they are clearly erroneous, but we apply the facts to the law de novo. *Lajara v. State*, 263 Ga. 438 (3) (435 SE2d 600) (1993). Because an ineffective assistance of counsel claim must show both deficient attorney performance and prejudice, the claim can be denied solely on the absence of sufficient prejudice. Id. For the reasons set forth below, we conclude as a matter of law that the absence of the deficiencies in Lance's trial counsel's performance would not in reasonable probability have resulted in a different outcome in either phase of Lance's trial. See *Schofield v. Holsey*, 281 Ga. 809, 812, n. 1 (642 SE2d 56) (2007) (holding that the combined effect of trial counsel's deficiencies should be considered in weighing prejudice). Accordingly, we reverse the habeas court's judgment insofar as it granted a new sentencing trial based on trial counsel's ineffectiveness, and we affirm the habeas court's judgment insofar as it denied relief regarding the guilt/innocence phase based on trial counsel's ineffectiveness.

A. *Mental Health Evidence*

The habeas court concluded that trial counsel performed deficiently in failing to prepare for Lance's trial by investigating Lance's background. We agree. The record is clear that, while trial counsel met repeatedly with Lance and with various members of his family, trial counsel failed to question them on issues related to potential

mitigating evidence other than those issues related to residual doubt as to Lance's guilt. Trial counsel testified in the habeas court that Lance claimed that he was innocent, that his family members believed that he was innocent, and that trial counsel did not want to alienate them by asking questions related to what could be presented at trial in the event that Lance were convicted. Trial counsel explained that he had hoped to obtain the assistance of co-counsel so that co-counsel could discuss the sentencing phase with them. However, we hold that trial counsel performed well below basic professional standards by choosing not to discuss issues other than guilt and innocence with Lance and his family even after the request for co-counsel was denied. The Warden argues that trial counsel did not perform deficiently because counsel's strategy of relying on jurors' residual doubt in the sentencing phase was reasonable. See *Head v. Ferrell*, 274 Ga. 399, 405 (V) (A) (554 SE2d 155) (2001) (reliance on residual doubt can be a reasonable strategy in the sentencing phase). However, trial counsel's performance in selecting a strategy must be regarded as deficient because that strategic choice was made without trial counsel's first conducting a reasonable investigation. See *Wiggins*, supra, 539 U. S. at 521-523 (II) (A); *Strickland*, supra, 466 U. S. at 690-691 (III) (A). See also *Porter v. McCollum*, ___ U. S. ___ (II) (130 SC 447, 452-453, 175 LE2d 398) (2009). The question then before us is whether trial counsel's deficient performance in failing to adequately investigate issues beyond guilt and innocence, when considered together with any other deficiencies in trial counsel's performance at trial, in reasonable probability changed the outcome of Lance's trial. We hold as a matter of law that it did not.

The habeas court concluded that there would have been a reasonable probability of a different outcome in the sentencing phase of Lance's trial if trial counsel had prepared properly for the sentencing phase, because that preparation would have led counsel to discover and use mental health evidence. We disagree with this conclusion for two independent and individually-sufficient reasons, which are discussed below. We also disagree with Lance's contention in his cross-appeal that an adequate investigation of mental health evidence would have led to a reasonable probability of a different outcome in the guilt/innocence phase.

1. *Mental Health Evidence Likely Available*

First, we conclude that there is no reasonable probability that the information available to trial counsel through a reasonable initial investigation into Lance's mental health background would have led the trial court to grant funds for the type of in-depth and extensive mental health evaluation upon which Lance now largely relies. If trial counsel had properly interviewed lay witnesses, he

would have discovered the following allegations about Lance's past: Lance had been in a number of automobile crashes, including some that might have resulted in brief unconsciousness and one that was caused by his fleeing from the police while drunk; Lance had once been exposed to toxic fumes while cleaning the inside of an oil tank; Lance had once ingested some gasoline as a child and had temporarily stopped breathing; Lance had a long history of abusing alcohol; and Lance had once suffered a shot to the head, which did not penetrate his skull, which led to his being hospitalized followed by his leaving the hospital against medical advice, and which resulted in recurring headaches. Trial counsel also could have obtained records from Georgia Regional Hospital, but those records would have informed trial counsel merely that Lance was having difficulty adjusting to his divorce, that he was depressed, that his depression was associated with his facing kidnapping and aggravated assault charges for an alleged attack on his ex-wife, and that he abused alcohol.

We find it doubtful that this information would have led reasonable counsel to seek a psychological evaluation of Lance, particularly given the reasonableness of trial counsel's stated desire to prioritize his requests for funds for various experts. Nor would the trial court have abused its discretion, if it had been asked by trial counsel for funds for a psychological evaluation of Lance, by determining that this information failed to show that the assistance of a psychologist was critical to Lance's defense. See *Roseboro v. State*, 258 Ga. 39 (3) (d) (365 SE2d 115) (1988). This is particularly true because Lance had already been examined in a psychological hospital and yet no obvious symptoms of impairment were noted other than Lance's alcohol abuse and his failure to adjust to his divorce. Finally, even if the trial court had exercised its discretion to order a psychological examination, we find that it would have been extremely appropriate and thus highly likely that the trial court would have first ordered a general psychological screening rather than the extensive neuropsychological examination that Lance has undergone during his habeas proceedings. The probable result of such a general psychological examination is suggested by the absence of any reference to neuropsychological difficulties in the records from Lance's psychological evaluation at Georgia Regional Hospital (as discussed above) and by the habeas testimony from the Warden's neuropsychologist, asserting that a typical court-ordered psychological examination might not have shown any cause for a more detailed neuropsychological examination "because of the relatively mild nature" of Lance's mental neurological deficits. Accordingly, we conclude that it is unlikely that the trial court would have been informed through a general psychological examination of any possibly significant neuro-

370

logical deficits and, more importantly, that it is unlikely that the trial court would have exercised its discretion, in the face of such mild symptoms, to order a full neuropsychological examination. Given the multiple levels of unlikelihood at issue here — that reasonable counsel would seek an evaluation, that the trial court would grant the request, that the initial evaluation would give any suggestion of a need for a full neuropsychological examination, and that the trial court would have ordered a full neuropsychological examination — we conclude that there is no reasonable probability that a reasonable investigation of Lance's background by counsel would have led to his having access to the type of specialized neuropsychological testimony that Lance has presented in the habeas court.

We do note the significant likelihood that a general psychological examination would have included an assessment of Lance's intelligence. However, none of the experts has diagnosed Lance as falling within the generally-accepted definition of mental retardation. Upon our review of all of the evidence presented at trial and shown in the habeas court to have been available to trial counsel, we conclude that evidence of Lance's moderate slowness would not have had a significant effect on the jury's sentencing phase deliberations, particularly in light of the evidence showing that Lance functioned normally in society apart from his criminal behavior. We also conclude that this evidence of moderate slowness would have had essentially no effect on the jury's guilt/innocence phase deliberations. Compare OCGA § 17-7-131 (a) (3) and (j) (allowing for guilty but mentally retarded verdicts in the guilt/innocence phase that exempt defendants from the death penalty).

2. *Additional Mental Health Evidence Conceivably Available*

Above, we have analyzed the prejudice portion of Lance's ineffective assistance of counsel claim in light of our conclusion that there is no reasonable probability that trial counsel, if he had adequately investigated Lance's background, ultimately would have obtained an extensive neuropsychological examination like the one Lance has relied upon in the habeas court. We now turn to our alternative analysis of prejudice, which begins with the assumption that trial counsel would have obtained such a specialized examination.

Lance presented testimony in the habeas court from three experts in neuropsychology. Thomas Hyde, M.D., Ph.D., testified that he administered over 100 neurological tests to Lance. Yet, as his testimony establishes, only one of those tests indicated brain dysfunction. Dr. Hyde concluded that Lance had "significant damage to the frontal and temporal lobes" resulting from multiple blows to the head and from alcohol abuse. He testified that persons with frontal lobe dysfunction "often decompensate under periods of extreme

emotional distress." He also testified that such persons are unlikely to be able to plan and commit murder without leaving evidence but, instead, are more often "involved in crimes of impulse." Dr. Hyde concluded that Lance's mental state might have had an "impact" on Lance's "ability to appreciate the criminality of his conduct or to conform his conduct to the requirements of law," but he also acknowledged that other "reasonable" neurologists might disagree with his conclusions in Lance's case. The second of Lance's three experts in neuropsychology, Ricardo Weinstein, Ph.D., commented generally on Lance's "psychosocial history" as follows:

[I]t's a relatively unusual case in terms of his upbringing, fairly normal upbringing from an intact family, no major history of dysfunction, no history of child abuse, neglect, things of that nature, no history of significant mental illness in the family.

However, Dr. Weinstein concluded that Lance, as a result of multiple head injuries, the exposure to toxic fumes, the ingestion of gasoline, and a history of "heavy alcohol use starting at the age of 19," suffered from "generalized and diffuse brain dysfunction" and "clear compromises in the frontal lobe functions." Dr. Weinstein concluded that Lance was not insane or mentally retarded, that he understood "that certain behaviors are unacceptable," but that his "brain dysfunction . . . negatively impact[ed] his ability to conform his conduct to the requirements of the law." In particular, Dr. Weinstein concluded that Lance would have difficulty in planning and in impulse control and that the combined effects of Lance's brain dysfunction and his alcohol intoxication on the night of the murders would have rendered "his capacity to think in a logical, well-directed manner . . . equivalent or similar to an individual that suffers from mental retardation." Finally, Lance presented testimony from a third expert, David Pickar, M.D., who concluded that Lance, as a result of multiple head traumas and alcohol abuse, suffered from "impaired intellectual and frontal lobe function" that resulted in impairments of his ability to plan and to control his impulses.

The Warden presented expert testimony from one[1] neuropsychologist, Daniel A. Martell, Ph.D. Dr. Martell's findings regarding Lance's IQ were consistent with those of Lance's experts, and he

---

[1] The Warden also placed in the record a report by David Griesemer, M.D. However, as Lance correctly noted in a written objection, this unsworn statement was inadmissible hearsay that should not have been considered by the habeas court. See *Waldrip v. Head*, 279 Ga. 826, 828 (II) (A) (620 SE2d 829) (2005). But see OCGA § 9-14-48 (a) (providing that a habeas court "may receive proof by . . . sworn affidavits").

concluded that Lance functioned within "a range that's higher than mild mental retardation but lower than average." Dr. Martell added, however, that he had administered an additional test to determine what Lance's IQ had been before any possible brain injuries and that the test showed Lance's earlier IQ to fall within the "exact same ranges" as found by the various experts who testified in the habeas court. Dr. Martell testified that some of Lance's test results indicated frontal lobe dysfunction, but Dr. Martell further testified as follows:

> His weaknesses with regard to frontal lobe have to do with a tendency to perseverate or repeat himself and mild to moderate impairment in problem-solving abilities in certain contexts like adapting to changing problems but not others like planning an effective strategy for solving a problem. However, his ability to inhibit unwanted or impulsive behaviors appears to be relatively intact. And I think that's important in my analysis with regard to the issue of the crime itself because these data do not suggest to me that he is, in fact, impulsive or unable to control his impulses.

Dr. Martell concluded that Lance's frontal lobe dysfunction would not have prevented him from planning the murders and would not have made him so impulsive that he could not prevent himself from committing the murders. As we noted above, Dr. Martell also stated that Lance's symptoms were so subtle that a typical court-ordered evaluation might not have given any indication of problems. Dr. Martell summarized his opinion by stating, "In my opinion, [Lance's diagnosis is] not significant to the crime."

The habeas court considered the mental health evidence summarized above and concluded that presentation of that evidence at trial in reasonable probability would have changed the outcome of the sentencing phase. We conclude as a matter of law that the habeas court erred by reaching this conclusion regarding prejudice. We agree with Lance's argument that trial counsel could have presented mental health evidence without abandoning his sentencing phase strategy of showing residual doubt because the mental health evidence was not directly inconsistent with that theory and might have enhanced it slightly, e.g., by indicating that, due to Lance's mental condition, it might have been more difficult for him to have carried out the murders without leaving more evidence than was actually discovered during the investigation of the crimes. However, assuming trial counsel would have chosen to present the mental health evidence, even the most favorable aspects of that evidence showed merely that Lance functioned, when sober, in the lower range of normal intelligence; that he had some memory problems;

that he suffered some depression related to his inability to accept his divorce; that he had some difficulty in planning and problem solving; that he might have been somewhat impulsive; and that his functional intelligence, unsurprisingly, became more impaired when he was drunk. Against this somewhat mitigating evidence, the jury would have weighed Lance's long history of horrific abuse against Joy Lance, including multiple threats to kill her and at least one previous attempt to murder Butch Wood in a manner that was very similar to the manner in which he eventually succeeded in murdering him and Joy Lance. The jury also would have weighed the new evidence against the evidence about the night of the murders, which showed that Lance armed himself with a shotgun, traveled to the home where the victims were staying, kicked in the door, and systematically murdered them. Finally, the jury would have weighed the new evidence against the evidence about Lance's demeanor and conduct after the murder, including the derogatory manner in which he referred to Joy Lance, his statement that Butch Wood was in "Hell," his lament to an inmate that he had acted foolishly by calling Joy Lance's father shortly before committing the murders, and his boast to an inmate that "he hit Joy so hard that one of her eyeballs stuck to the wall." Given Lance's long history of contemplating the murder of Joy Lance and Butch Wood, the manner in which he finally carried out their murders, and his utter disregard for their suffering and deaths afterward, we conclude that the new evidence of Lance's subtle neurological impairments, even when considered together with the other mitigating evidence that was or should have been presented at trial, would not in reasonable probability have changed the outcome of the sentencing phase if it had been presented at Lance's trial. Compare *Porter v. McCollum*, supra, ___ U. S. ___ (III) (130 SC at 453-456).

We also conclude, contrary to Lance's arguments in his cross-appeal, that the new evidence of subtle neurological impairments would not have significantly affected the jury's deliberations during the guilt/innocence phase. Given the weakness of the new mental health evidence and the overwhelming evidence of the intentional and deliberate nature of Lance's crimes, we conclude that it is essentially beyond possibility that the jury would have failed to convict Lance of the murders. We further conclude that it would have been highly unlikely that the new mental health evidence would have led the jury to render a verdict of guilty but mentally ill, which would not foreclose a death sentence in any event. See OCGA § 17-7-131 (a) (2) (defining "[m]entally ill"). See also *Lewis v. State*, 279 Ga. 756, 764 (12) (620 SE2d 778) (2005) (holding that "the statute that provides for a verdict of guilty but mentally ill does not preclude a death sentence as the result of such a verdict").

374

## B. *Evidence from Forensic Experts*

Lance argues that his trial counsel rendered ineffective assistance in the manner in which he sought funds for forensic experts and, alternatively, that the trial court's denial of those funds rendered trial counsel ineffective at trial. We conclude that both of these claims lack merit.

### 1. *Trial Counsel's Alleged Ineffective Assistance in Seeking Funds*

We first address Lance's contention that his trial counsel rendered ineffective assistance in the manner in which he sought funds for forensic experts. We conclude that trial counsel did not perform deficiently, and we further conclude that Lance did not suffer significant prejudice to his defense even if trial counsel could be perceived as having performed deficiently.

On direct appeal, this Court rejected a claim that the trial court had abused its discretion in denying Lance's request for additional funds for expert assistance, concluding that "Lance's request for the contested funds [had been] too unspecific, uncertain, and conclusory" to require the granting of additional funds. *Lance*, supra, 275 Ga. at 13-14 (2). Although this Court's comments, on the surface, might suggest that trial counsel necessarily performed deficiently in making his request, upon closer examination we conclude that he did not. Instead, we conclude that trial counsel's request for funds appeared weak simply because there was no compelling reason for those funds to be granted. See *Roseboro*, supra, 258 Ga. at 40-41 (3) (c) and (d) (holding that a request for funds for expert testimony must show, inter alia, that the testimony is crucial and is subject to varying expert opinions).

Lance complains that trial counsel failed to obtain expert assistance in order to show the time of the victims' deaths. Our review of the record reveals that there is, even now, no substantial dispute among the experts regarding the time of death but, instead, that there is merely a dispute over the manner in which the time of death was established. Lance argues that his trial counsel should have obtained an expert to testify that the repeated blows to Joy Lance's face with the butt of the shotgun likely would have resulted in the perpetrator being spattered with blood and brain matter, which would then have likely left stains in any automobile used immediately afterward. However, not only would this fact have been obvious to the jury, it furthermore would have been consistent with Lance having disposed of any bloody clothes at the same time he obviously disposed of his distinctive shoes and would have been consistent with the testimony from a State witness indicating that Lance said he had initially walked away from the crime scene rather than driving away in his automobile. Lance argues that his trial

counsel should have obtained an expert to testify that there were no shoe prints at the crime scene other than the one on the front door and that scientific testing could not establish the time when the shoe print on the door was made. However, the absence of shoe prints was not a matter that was subject to varying scientific opinions, and the time at which the print was left on the door was a matter of common sense given the fact that the door had obviously been kicked in during the murders and the fact that the shoe print matched shoes that Lance wore. Similarly, it was a matter of common sense and not subject to varying scientific opinions that it was possible that the murders could have been committed by more than one person and that the identity of the perpetrator could not be determined by fingerprint evidence because no identifiable fingerprints had been discovered. Finally, Lance complains that his trial counsel failed to obtain an expert in polygraph science to testify that the results of the polygraph examination taken by Joe Moore[2] were "inconclusive" in response to the testimony volunteered by Joe Moore indicating that he had passed his polygraph test. However, Moore's volunteered testimony was ruled inadmissible, and the jury was instructed to disregard it. See *Waldrip*, supra, 279 Ga. at 830-831 (II) (C) (addressing admissibility of polygraph results in death penalty trials).

Because, as we have briefly outlined above, none of the expert testimony that Lance contends his trial counsel should have obtained was crucial to his defense, we hold as a matter of law both that trial counsel did not perform deficiently in the manner in which he sought funds for that testimony and that Lance did not suffer prejudice by trial counsel's failure to obtain funds for that testimony.

2. *Trial Court's Alleged Error*

Lance makes the alternative argument that the trial court rendered his trial counsel ineffective by denying his motion for funds for the expert testimony discussed above. We reject this claim for two independent reasons. First, as we have discussed above, denial of those funds was not improper and did not result in significant prejudice to Lance's defense. Second, we hold that this claim is barred because it was raised and rejected on direct appeal. See *Head v. Hill*, 277 Ga. 255 (III) (587 SE2d 613) (2003). Although the focus of Lance's argument on direct appeal regarding experts was on *Ake v. Oklahoma*, 470 U. S. 68 (105 SC 1087, 84 LE2d 53) (1985), which was decided solely on the basis of due process, Lance's argument on direct appeal also invoked the Sixth Amendment. Raising this

---

[2] Joe Moore was the friend who accompanied Lance during the 1993 attempt to murder Joy Lance and Butch Wood and to whom Lance made incriminating statements after the murders.

additional ground on direct appeal, rather than saving it for when new counsel began representing Lance, was appropriate, because this form of Sixth Amendment claim does not involve the potential conflict of interest inherent where a lawyer accuses himself or herself of having made unprofessional choices. See id. at 87, n. 13 (noting, but declining to address, the possibility that a trial court's denial of expert funds might raise Sixth Amendment concerns, in addition to due process concerns, that could be considered on direct appeal); *Strickland*, supra, 466 U. S. at 686 (noting that there are Sixth Amendment claims regarding governmental interference with the right to counsel that are distinct from claims regarding trial counsel's own deficient performance). Compare *Glover v. State*, 266 Ga. 183, 183-185 (2) (465 SE2d 659) (1996) (holding that a claim alleging that trial counsel himself or herself acted outside of the bounds of professional competence must be raised at the earliest practicable moment). Having been timely raised, the claim was rejected by this Court. *Lance*, supra, 275 Ga. at 13-14 (2). Thus, it is now barred.

C. *Combined Effect of Trial Counsel's Deficiencies*

Above, we have commented on the prejudicial effect arising from each of trial counsel's deficiencies that we either have found to exist or have assumed to exist, and we have found each separately not to have been significantly prejudicial. Considering now the combined effect of those deficiencies, we conclude that the absence of those deficiencies would not in reasonable probability have affected the verdict at either phase of Lance's trial. Compare *Porter v. McCollum*, supra, ___ U. S. ___ (III) (130 SC at 453-456). See also *Holsey*, supra, 281 Ga. at 812, n. 1 (holding that the combined effect of trial counsel's deficiencies should be considered in weighing prejudice).

## III. *Claims that are Barred as Previously Litigated*

Lance argues that the habeas court erred by finding certain claims to be barred by this Court's denial of those same claims on direct appeal. A habeas court should not reconsider issues previously addressed by this Court where there has been no change in the law or the facts since this Court's decision. See *Hill*, supra, 277 Ga. at 263 (III) (habeas court "properly found claims previously rejected by this Court in Hill's direct appeal to be barred by res judicata"); *Bruce v. State*, 274 Ga. 432, 434 (2) (553 SE2d 808) (2001) ("Without a change in the facts or the law, a habeas court will not review an issue decided on direct appeal."). But see *Hill*, supra at 257 (II) (A) (1) (noting that a claim based on new law may only serve as the basis for habeas corpus relief if the new law is of the type that is given retroactive effect). We conclude that Lance has failed to show any

new law or new facts that justify the reconsideration of the claims he raised on direct appeal.

A. Lance claims that the State knowingly presented false testimony from a witness at trial, Frankie Shields. See *United States v. Agurs*, 427 U. S. 97, 103 (II) (96 SC 2392, 49 LE2d 342) (1976) (a conviction "obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury"). At trial, Shields denied that his testimony was part of a deal with the State. While Lance's original direct appeal was pending, this Court was informed that Shields had written a letter to a newspaper claiming that there had in fact been a deal. This Court struck the original direct appeal from its docket and remanded the case for an evidentiary hearing in the trial court on the matter. At that hearing, Shields testified that there had been no deal, and this Court held on appeal from that hearing that the "evidence authorized the trial court to find that no deal had been offered to or made with Shields by the State." *Lance*, supra, 275 Ga. at 25 (35). In the habeas court, Lance once again claimed that the State had made a deal for Shields's trial testimony. At the evidentiary hearing in the habeas court, Shields again admitted that he had spoken with Lance in the jail and that Lance had drawn a map of the area where the murders occurred, but Shields claimed that he had testified falsely in the trial court about Lance's confession to him and about there being no deal with the State for his testimony. The habeas court found Lance's claim to be barred; however, in an apparent abundance of caution, the habeas court also made the reasonable finding of fact that Lance, in light of all of the evidence presented, had failed to prove that Shields's trial testimony was actually false. Similarly, we pretermit whether the evidence Lance presented in the habeas court constitutes the type of new alleged facts that could ever warrant setting aside the procedural bar to his claim, and we hold that his claim is meritless because Shields's trial testimony was not actually false.

Similarly, to the extent that Lance can be deemed to have sufficiently raised related claims regarding his intent to commit the murders and the proportionality of his death sentence, we deem those claims also to be meritless, even if they are not barred.

B. Lance claims that the trial court erred by admitting evidence of his prior conduct toward the victims and other persons. Lance has failed to show any new facts or new law that would justify this Court's revisiting its previous holding that this evidence was proper. See *Lance*, supra, 275 Ga. at 19 (15), (16), and (18). Thus, this claim remains barred.

C. Lance argues in summary terms that the habeas court erred

by refusing to grant relief based on other claims that were considered and rejected by this Court on direct appeal. We conclude that Lance's arguments regarding these claims are "so lacking in specific argument" that they should be deemed abandoned. See Supreme Court Rule 22; *Hill*, supra, 277 Ga. at 269 (VI) (A).

### IV. *Claims that are Procedurally Defaulted*

Lance also argues in summary terms that the habeas court erred by denying various claims because they were barred by procedural default. See *Turpin v. Todd*, 268 Ga. 820 (2) (493 SE2d 900) (1997) (addressing procedural default); OCGA § 9-14-48 (d). We conclude that Lance's arguments regarding these claims are "so lacking in specific argument" that they should be deemed abandoned. See Supreme Court Rule 22; *Hill*, supra, 277 Ga. at 269 (VI) (A).

### V. *Remaining Claims that are Abandoned*

Lance's remaining claims, which are presented as a mere list and which are supported only by an improper attempt to incorporate arguments made in the habeas court rather than in this Court, are likewise deemed abandoned. *Hill*, supra, 277 Ga. at 269 (VI) (A).

*Judgment reversed in Case No. S09A1536. Judgment affirmed in Case No. S09X1538. Carley, P. J., Benham, Thompson, Hines and Melton, JJ., and Judge Gregory A. Adams, concur. Nahmias, J., disqualified.*

DECIDED JANUARY 25, 2010.

*Thurbert E. Baker, Attorney General, Patricia B. A. Burton, Assistant Attorney General*, for appellant.

*King & Spalding, L. Joseph Loveland, Jr., James W. Boswell III*, for appellee.