# SUPREME COURT OF THE UNITED STATES

## DONNIE CLEVELAND LANCE *v.* ERIC SELLERS, WARDEN

### ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

No. 17–1382.   Decided January 7, 2019

The petition for a writ of certiorari is denied.

JUSTICE SOTOMAYOR, with whom JUSTICE GINSBURG and JUSTICE KAGAN join, dissenting from denial of certiorari.

Before deciding that petitioner Donnie Cleveland Lance should die as punishment for two murders he committed, a jury heard no evidence whatsoever to counterbalance the State's case for the death penalty. Lance's counsel bore responsibility for the one-sidedness of the sentencing proceedings; he inexcusably failed even to look into, much less to put on, a case for sparing Lance's life. And we have since learned that Lance suffers from significant cognitive impairments that the jury could have weighed in assessing his moral culpability. In other words, there is a meaningful case to be made for sparing Lance's life, but—because he lacked access to constitutionally adequate counsel—he has never had a chance to present it.

The Georgia Supreme Court concluded that this state of affairs was constitutionally tolerable because, in its view, Lance's untold story stood no chance of persuading even a single juror to favor life without parole over a death sentence. The U. S. Court of Appeals for the Eleventh Circuit held that its conclusion was not unreasonable. I cannot agree. Our precedents clearly establish that Lance was prejudiced by his inability to inform the jury about his impairments. I therefore would grant Lance's petition for review and summarily reverse.

SOTOMAYOR, J., dissenting

# I

## A

The facts of Lance's crimes—murdering his ex-wife, Sabrina "Joy" Lance, and her boyfriend, Dwight "Butch" Wood, Jr., in 1997—admittedly inspire little sympathy. Lance went to Butch's home, kicked in the front door, shot Butch with a shotgun, then bludgeoned Joy to death with the gun. According to a fellow inmate, he later bragged about the killings. Lance also had an extensive prior history of domestic violence against Joy.[1]

Due to his counsel's ineffectiveness, however, those facts were all the jurors ever learned about Lance; they heard no evidence why his life was worth sparing. Lance was represented during both the guilt and penalty phases of his trial by a solo practitioner who became convinced of Lance's innocence—and his own ability to prove it—early in the representation. He thus prepared exclusively for the guilt-or-innocence phase of the trial. Counsel did not even broach the subject of possible penalty-phase evidence with Lance or his family, because he did not want them "thinking that [he] might be thinking in terms of losing the case." App. to Pet. for Cert. 232. So when the jury found Lance guilty and the question became whether Lance should be put to death,[2] Lance's counsel had no evidence whatsoever to present.

————————

[1] Lance previously had kidnapped Joy, electrocuted her, beaten her, strangled her, and threatened her with various other harms. He also repeatedly had threatened to kill her if she left him or became involved with Butch. Four years earlier, Lance and a friend took a shotgun to Butch's home and kicked in the door, but fled when a child inside spoke to them.

[2] The jury found that two aggravating circumstances supported Lance's eligibility for the death penalty: that he committed a double murder and that Joy's killing was "outrageously or wantonly vile, horrible, or inhuman." App. to Pet. for Cert. 74; *Lance* v. *State*, 275 Ga. 11, 23, 560 S. E. 2d 663, 677 (2002); see also Ga. Code Ann. §§17–10–30(b)(2), (b)(7) (Supp. 2018).

The State did.  It called six witnesses, including the victims' relatives, to explain why Lance deserved to die. The State's closing argument emphasized Lance's history of violence against Joy, the brutality of her killing, and Lance's apparent lack of remorse.  The State urged the jury to perceive Lance as "'cold and calculating'" and repeatedly asked "'what kind of person'" would do these things.  1 App. in No. 16–15008 (CA11), pt. 1, pp. 68, 75, 77.  Lance's counsel, by contrast, made no opening statement and presented no mitigating evidence.  By his own admission, he "had nothing to put on."  App. to Pet. for Cert. 273.  His closing argument merely urged the jury to consider Lance's family and to resist the temptation to exact vengeance.  About Lance, counsel said only that he was "'kind of a quiet person and a country boy'" who "'doesn't talk a lot.'"  1 App. in No. 16–15008, pt. 1, at 85.

The jury sentenced Lance to death.

B

In 2003, Lance filed a petition for postconviction relief in state court, asserting that his trial counsel's failure to investigate or present any mitigating evidence was ineffective assistance of counsel.  Essentially, he argued that there was a meaningful case to be made for sparing his life, and that his counsel had forfeited his chance to do so through inattention.

The evidence showed that counsel could have found possible cognitive problems had he looked into Lance's personal history.  That history included repeated serious head traumas caused by multiple car crashes, alcoholism, and—most seriously—Lance's once being shot in the head by unknown assailants while lying on his couch.[3]  In the

––––––––––

[3] In addition to the history discussed by the court, Lance also ingested gasoline as a small child, was trampled by a horse as a teenager, and once was overcome by fumes while working to clean the interior of an oil tanker truck.  1 App. in No. 16–15008, pt. 2, pp. 202–203.

aftermath of the shooting, Lance had "terrible headaches," "dizziness," "difficulty working," and "became even more quiet than he had before." App. to Pet. for Cert. 171–172. The court found that any reasonable defense attorney would have had Lance's mental health evaluated and, in so doing, uncovered "significant mitigating evidence for the jury to consider." *Id.,* at 174.

Four mental health professionals testified at an evidentiary hearing.[4] They agreed on many points. First, Lance had permanent damage to his brain's frontal lobe. Second, his IQ placed him in the borderline range for intellectual disability. Third, his symptoms warranted a diagnosis of clinical dementia. The experts differed somewhat, however, over the extent and practical consequences of Lance's brain damage. Primarily, the experts seemed to disagree about the extent to which Lance's brain damage affected his impulse control.[5]

The Superior Court granted Lance's habeas petition and vacated his death sentence, holding that trial counsel's failure to investigate and present evidence of Lance's mental condition was deficient performance, and that his failure prejudiced Lance. The missing evidence could have

—————

[4] Lance put on Thomas Hyde, an expert in behavioral neurology; Ricardo Weinstein, an expert in neuropsychology; and David Pickar, an expert in psychiatry and clinical neuroscience. The State called Daniel Martell, an expert in neuropsychology. (A fifth expert's unsworn report was ruled inadmissible by the Georgia Supreme Court. See *Hall* v. *Lance*, 286 Ga. 365, 371, n. 1, 687 S. E. 2d 809, 815, n. 1 (2010).)

[5] Hyde, Weinstein, and Pickar opined that the type and extent of damage reflected in Lance's test results would adversely affect his ability to suppress impulsive behavior. Weinstein and Hyde added that the damage could impair Lance's ability to conform his conduct to the law, and Hyde noted that the effects of Lance's impairments would be most acute in moments of emotional stress. Martell, in contrast, saw no direct evidence of impulse-control difficulties and opined that Lance's brain damage would not "'prevent him'" from conforming his conduct to the law. 1 App. in No. 16–15008, pt. 3, at 170.

prompted a different sentence, the court explained, because it went directly to the key issue before the jury: the assessment of Lance's character, culpability, and worth.

The Georgia Supreme Court, however, reversed and reinstated Lance's death sentence. *Hall* v. *Lance*, 286 Ga. 365, 687 S. E. 2d 809 (2010). It agreed that counsel's performance was deficient but held that Lance suffered no prejudice. As relevant here, it held that even if the jury had considered at trial all the neuropsychological evidence adduced at the postconviction hearing, there was no reasonable probability that Lance's sentence would have changed.[6] In the Georgia Supreme Court's view, the new evidence was only "somewhat mitigating" because it showed only "subtle neurological impairments," which would necessarily have been outweighed by Lance's prior threats and violence toward the victims, the nature of the crime, and Lance's statements and demeanor in its aftermath. *Id.,* at 373, 687 S. E. 2d, at 815–816.

C

Lance sought a federal writ of habeas corpus. The U. S. District Court for the Northern District of Georgia denied the petition but granted a certificate of appealability. Under the deferential review provisions of the Antiterrorism and Effective Death Penalty Act of 1996, 28 U. S. C. §2254(d), the U. S. Court of Appeals for the Eleventh Circuit affirmed, holding that the Georgia Supreme Court's conclusion that the absence of the postconviction mental health evidence caused Lance no prejudice "was not unreasonable." *Lance* v. *Warden*, 706 Fed. Appx. 565, 573 (2017).

---

[6] As an alternative ground for finding no prejudice, the Georgia Supreme Court also hypothesized that even an adequate investigation would not have uncovered the evidence that Lance presented at the postconviction hearing. That conclusion is not implicated by Lance's petition because the Court of Appeals did not address it.

## II

To prevail on a Sixth Amendment ineffective-assistance-of-counsel claim, a defendant must show both that his counsel's performance was deficient and that his counsel's errors caused him prejudice. In assessing deficiency, a court asks whether defense "counsel's representation fell below an objective standard of reasonableness." *Strickland* v. *Washington*, 466 U. S. 668, 688 (1984). To establish prejudice, a defendant must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.,* at 694. When, as here, a petitioner seeks federal habeas review of a state court's rejection of his ineffective-assistance-of-counsel claim, he can prevail only if the decision was "contrary to, or involved an unreasonable application of," *Strickland* and its progeny, or rested "on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U. S. C. §2254(d).

Because the Supreme Court of Georgia mischaracterized or omitted key facts and improperly weighed the evidence, I agree with Lance that its decision was an objectively "unreasonable application of" our precedents. §2254(d)(1); see *Wiggins* v. *Smith*, 539 U. S. 510, 528 (2003). I would therefore grant the petition and summarily reverse.

## A

With regard to *Strickland*'s performance prong, the Georgia Supreme Court determined that trial counsel's failure to investigate possible mitigation was deficient. See *Lance*, 286 Ga., at 368, 687 S. E. 2d, at 812–813. That is plainly correct. Counsel in a death penalty case has an obligation at the very least to consider possible penalty-phase defenses. See *Wiggins*, 539 U. S., at 521–522. By his own admission, counsel here did not. Without any inquiry into what penalty-phase evidence he might be

forgoing, he succumbed to tunnel vision—and as a consequence left Lance defenseless. Because nothing here "obviate[d] the need for defense counsel to conduct *some* sort of mitigation investigation," Lance has satisfied *Strickland*'s deficient-performance requirement. *Porter* v. *McCollum*, 558 U. S. 30, 40 (2009) (*per curiam*); see also *Rompilla* v. *Beard*, 545 U. S. 374, 381 (2005); *Wiggins*, 539 U. S., at 534.

B

Turning to the prejudice prong, the Court of Appeals was wrong to conclude that Lance suffered no clearly established prejudice from his inability to make his case. Georgia law permits a death sentence only upon a unanimous jury recommendation, so Lance needed only to show "a reasonable probability that at least one juror would have struck a different balance" between the aggravating and the mitigating factors had he or she considered the missing evidence. *Wiggins*, 539 U. S., at 537; see Ga. Code Ann. §§17–10–31(a), (c).[7] The trial court, upon hearing Lance's proffered mitigation evidence, concluded that it was "extremely important for the jury to consider" and thus that its absence was prejudicial. App. to Pet. for Cert. 174. Under any reasonable application of *Strickland* and its progeny, that conclusion was correct. See 28 U. S. C. §2254(d); *Wiggins*, 539 U. S., at 528.

To determine whether a defendant reasonably might have been spared a death sentence but for his counsel's deficiency, courts take into account "the totality of the

_____

[7] In Georgia, "a sentence of death shall not be imposed unless the jury verdict includes a finding of at least one statutory aggravating circumstance and a recommendation that such sentence be imposed." Ga. Code Ann. §17–10–31(a). "If the jury is unable to reach a unanimous verdict as to sentence, the judge shall dismiss the jury and shall impose a sentence of either life imprisonment or imprisonment for life without parole." §17–10–31(c).

available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding," then "reweigh it against the evidence in aggravation." *Williams* v. *Taylor*, 529 U. S. 362, 397–398 (2000). "We do not require a defendant to show that counsel's deficient conduct more likely than not altered the outcome of his penalty proceeding, but rather that he establish a probability sufficient to undermine confidence in that outcome." *Porter*, 558 U. S., at 44 (internal quotation marks and alteration omitted).

The jurors who sentenced Lance determined whether he would live or die "knowing hardly anything about him other than the facts of his crimes." *Id.*, at 33. They heard nothing "that would humanize [Lance] or allow them to accurately gauge his moral culpability." *Id.,* at 41. Yet if counsel had performed his duties, the jurors would have heard that Lance's brain endured physical trauma throughout his life, resulting in frontal lobe damage and dementia. The jury further would have heard that Lance's IQ placed him within the borderline range for intellectual disability. The jury also would have heard that Lance's cognitive deficits could affect his impulse control and capacity to conform his behavior to the law, especially at moments of emotional distress. Taken together, those facts—with their accompanying explanatory potential to humanize Lance, or at least to render less incomprehensible his conduct—were significant mitigating evidence. See *id.*, at 36, 42–43 (noting the potentially mitigating effect of evidence that the defendant "suffered from brain damage that could manifest in impulsive, violent behavior" and was "substantially impaired in his ability to conform his conduct to the law").

To be sure, the evidence before the jury—the brutality of Joy's death, Lance's past violence toward her, and Lance's conduct thereafter—could have supported a death sentence. See Ga. Code Ann. §§17–10–30(b), 17–10–31(a).

But there is a stark contrast between no mitigation evidence whatsoever and the significant neuropsychological evidence that adequate counsel could have introduced as a potential counterweight. Lance's unintroduced case for leniency, even if not airtight, "adds up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury." *Rompilla*, 545 U. S., at 393; see also *Williams*, 529 U. S., at 398. Our precedents thus clearly establish Lance's right to a new sentencing at which a jury can, for the first time, weigh the evidence both for and against death.

The Georgia Supreme Court reached its contrary conclusion only by unreasonably disregarding or minimizing Lance's evidence. The state court acknowledged that experts would testify that "'significant damage'" to Lance's frontal lobe compromised his ability "'to conform his conduct to the requirements of the law.'" *Lance*, 286 Ga., at 370–371, 687 S. E. 2d, at 814. It failed, however, to allow for the possibility that the jury might credit that evidence. This Court previously has cautioned against prematurely resolving disputes or unreasonably discounting mitigating evidence in this context. See *Porter*, 558 U. S., at 43 ("While the State's experts identified perceived problems with the tests [showing brain damage and cognitive defects] and the conclusions [the defense expert] drew from them, it was not reasonable to discount entirely the effect that [the defense expert's] testimony might have had on the jury"). We should do so again here.

Further, the Georgia Supreme Court relied on characterizations of Lance's evidence that cannot be squared with the record, which "further highlights the unreasonableness of" the Georgia Supreme Court's decision. *Wiggins*, 539 U. S., at 528; see 28 U. S. C. §2254(d)(2). With regard to Lance's frontal lobe damage, the Georgia Supreme Court appears to have credited the testimony of the State's expert over Lance's experts' testimony, treating as

definitive Martell's assertion that "Lance's symptoms were so subtle that a typical court-ordered evaluation might not have given any indication of problems." *Lance*, 286 Ga., at 372, 687 S. E. 2d, at 815; see also *id.*, at 373, 687 S. E. 2d, at 816. Yet the other experts concluded that Lance's impairments and resulting behavioral distortions were "serious" and "significant."[8] *E.g.,* 1 App. in No. 16–15008, pt. 3, at 92; 2 *id.,* at 10. The Georgia Supreme Court also unreasonably dismissed the experts' consensus that Lance was in the borderline range for intellectual disability,[9] and never mentioned—much less discussed the significance of—Lance's dementia diagnosis.

These errors, taken together, make clear that the Georgia Supreme Court applied our *Strickland* precedents in an objectively unreasonable manner. The mental impairment evidence reasonably could have affected at least one juror's assessment of whether Lance deserved to die for his crimes, and Lance should have been given a chance to make the case for his life. The Georgia Supreme Court's conclusion that it would be futile to allow him to do so was unreasonable.

_____

[8] Moreover, it is unclear even that Martell's milder characterizations genuinely contradicted the other experts' testimony. Unlike the other experts, Martell seems at least sometimes to have been characterizing Lance's impairments "relative to his overall borderline [intellectually disabled] baseline," 1 App. in No. 16–15008, pt. 3, at 151, not relative to the average person or to the level at which Lance might have functioned absent his head traumas. Compare 2 *id.,* at 34 (Weinstein: specific test results "vastly excee[d] the threshold for impairment" and "indicate significant organic impairment of the frontal lobe"), with 2 *id.*, at 152 (Martell: results on the same test were "at a level expected for [Lance's] IQ" or "showed mild impairment").

[9] See *Lance*, 286 Ga., at 372, 687 S. E. 2d, at 815 (describing Lance as merely "in the lower range of normal intelligence"). But see, *e.g.,* 1 App. in No. 16–15008, pt. 3, at 135 (Martell, describing Lance's intellectual functioning as "in the borderline range," which is "lower than low average").

SOTOMAYOR, J., dissenting

## III

Absent this Court's intervention, Lance may well be executed without any adequately informed jury having decided his fate. Because the Court's refusal to intervene permits an egregious breakdown of basic procedural safeguards to go unremedied, I respectfully dissent.