[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-12603

_____

D.C. Docket No. 0:13-cv-62444-UU


DANA WILLIAMSON,

Petitioner - Appellant,

versus

FLORIDA DEPARTMENT OF CORRECTIONS,

Respondent - Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(November 3, 2015)

Before ED CARNES, Chief Judge, and WILLIAM PRYOR and ROSENBAUM,
Circuit Judges.

WILLIAM PRYOR, Circuit Judge:

Dana Williamson is a Florida prisoner sentenced to death who appeals the denial of his petition for writ of habeas corpus, 28 U.S.C. § 2254. Williamson broke into Robert and Donna Decker's home; robbed them; stabbed Donna to death with a kitchen knife; shot Robert in the head twice; shot Robert's 76-year-old father, Clyde Decker, in the head; and shot the couple's two-year-old son, Carl Decker, in the head. Charles Panoyan, a friend of both the Deckers and Williamson, was at the house during the murder. He told police what he witnessed but for three years denied knowing the identity of the assailant. Panoyan eventually disclosed Williamson's identity and testified that he had lied because Williamson threatened to torture and kill his family should he talk. At trial, the state called Dr. Richard Ofshe, a professor of sociology, who testified that Panoyan's behavior was consistent with the behavior of someone who had received credible death threats. Williamson argues that his counsel performed deficiently in violation of the Sixth Amendment by failing to challenge the admissibility of Dr. Ofshe's testimony. The Florida Supreme Court denied relief because it determined that it was not reasonably probable that the result of the proceeding would have been different even if Dr. Ofshe's testimony had been excluded. The district court denied Williamson's petition for a writ of habeas corpus. Because the decision of the Florida Supreme Court was reasonable, we affirm.

2

## I. BACKGROUND

On Friday, November 4, 1988, Robert Decker went to dinner at a restaurant with his 76-year-old father, Clyde, and his two-year-old son, Carl. When Robert returned home, Charles Panoyan, his friend and employee, was waiting in the driveway. At trial, Panoyan testified that he was there to bring Robert venison. The Deckers and Panoyan entered the house, and Robert sat down to watch the television show *Dallas*. Panoyan went to his truck to retrieve the venison and, soon after he returned, a masked man entered the house and placed a gun to Clyde's head. The gunman wore a stocking mask on his face, a distinctive yellowish-white straw cowboy hat, new work boots, blue-jean pants, and a blue-jean jacket. Robert asked Panoyan if he knew the gunman, but Panoyan did not answer. Robert said that he could tell by the look on Panoyan's face that he did.

The gunman ordered, "You all go over there, and I will put handcuffs on you. Lay on the floor in the living room." The gunman handcuffed Robert, Clyde, and Panoyan. He made Robert show him the location of Robert's safe, but he did not open it for fear that it was connected to an alarm. He placed Robert, Clyde, and Carl in the bedroom and tied their feet with rope. Robert loosened the rope from his ankles and walked to the bedroom doorway. He saw the gunman whispering with Panoyan in the living room. The gunman spotted Robert and retied him. The gunman rummaged through the house and Robert again freed himself. The gunman

3

then hog-tied Robert and asked him where he kept his money and drugs. Although Robert had $2,000 in cash, he told the gunman that there was no money. After the robbery, the money and several other items were missing. Panoyan testified that the gunman also tied him up during the robbery.

Donna Decker returned home and asked Panoyan what he was doing in the house. The gunman grabbed her, tied her hands, and dragged her into the hallway. A short time later, Donna returned to the bedroom to ask if the gunman was gone. Robert said no, and the gunman again grabbed Donna and dragged her out of the bedroom. Approximately thirty minutes later, the gunman returned to the bedroom with a legal-sized sheet of white paper with four straight lines drawn on it. Donna's signature was already on one line. The gunman made Robert sign the paper. He made Robert resign the paper because he was not satisfied with the quality of the signature after comparing it to the signature on Robert's driving license. The gunman left the room and Robert heard doors shutting.

The gunman re-entered the bedroom with a pillow. He immediately placed the pillow on Robert's head and shot him twice in the back of the head through the pillow. The gunman then put the pillow on the two-year-old's head and shot him in the head. The gunman put the pillow on Clyde's head and tried to shoot him, but the gun misfired. The gunman pulled the trigger again and it fired. All three survived. At some point—it is unclear whether this was before or after the

4

attempted murder of the three men—the gunman stabbed Donna repeatedly with a kitchen knife. Donna dialed 911 and said that she had been stabbed, gave her address, and mentioned her husband and child. When the police arrived, Donna was lying dead next to the telephone.

Panoyan testified that Williamson threatened him to ensure his silence. Williamson said, "[Y]ou know who I am and you know what I am capable of doing. . . . [Y]ou know my reputation. . . . I'll torture and kill any of your friends and your relatives and family to get to you." Panoyan knew Williamson's brutality not only from the events that had just occurred, but also because he knew that Williamson was reputed to have "killed a baby . . . and beat [another baby] so bad that it was brain dead." Panoyan also testified that Williamson had said, in graphic and obscene terms, exactly how he would rape, torture, and kill Panoyan's wife and three young children if Panoyan told anyone that Williamson was the murderer:

> He was going to pull [Panoyan's wife's] teeth out and fuck her in the mouth and ass. Him and the boys were. Then he was going to tie her up and fuck her from both sides. They were going to whip her, burn her, take her nipples off. Take her tits off. Skin her. Tie her. Take her guts out. Tie her over an ant pile. Break her fingers, her arms, her legs. He said they were going to do the same to my whole family. . . . He said he was going to cut my boy's balls off and feed it to him and do the same thing that he was going to do to my girls.

5

After threatening his family, Williamson untied Panoyan and ordered him to go outside with Rodney, Williamson's brother. Rodney held Panoyan at gunpoint and made him drive a short distance in his own truck. At the end of the block, Rodney instructed Panoyan to pull over and said that "if he had had his way he would have blown my fucking brains out right then and there." Rodney made the same threat to rape, torture, and murder Panoyan's wife and children if he told anyone about the murder. Williamson ran toward the truck without his hat or mask. He told Rodney that something had gone wrong, and he ordered Panoyan to go home and not call the police. They warned Panoyan that there was a man hiding outside his house. At the time, Panoyan believed that there were five men involved in the robbery: Dana, Rodney, a man outside Panoyan's house, a man hiding in the bushes outside the Deckers' house, and a getaway driver.

Panoyan drove away from Williamson and stopped at a shopping center. He approached a security guard and asked for a quarter to call his wife. The security guard testified that Panoyan was "[d]istraught" and his voice was "[s]haking." Panoyan made a phone call and told his wife to "get the kids and get out." The security guard reported Panoyan's odd behavior by radio to a police officer. The police officer confirmed that Panoyan appeared scared. He testified that Panoyan told him, "I have to get my wife and kids. I have to get them out of the house. I have to get them out. . . . They're watching my house. They know where I live."

6

The police took Panoyan to the police station, and he told the investigators what had happened but denied knowing the identity of the assailant. He later testified that he denied knowing Williamson's identity for three years because he was afraid for his family's safety.

In May 1990, the police received an anonymous tip implicating Williamson. They arrested Panoyan and Williamson, and charged both with murder. Panoyan testified that Williamson continued to intimidate him while they were imprisoned together. A fellow inmate testified that Williamson did not think that Panoyan would turn him in because Panoyan was afraid of him. The inmate testified that Panoyan knew that Williamson had previously killed a four-year-old child with a baseball bat. While imprisoned, Panoyan learned that Williamson and Rodney were the only ones involved in the murder, and there was no accomplice ready to kill his family. After eighteen months, the state released Panoyan on his own recognizance. Panoyan eventually told investigators that Williamson was the murderer. He testified before a grand jury and the state dropped all charges against him.

At trial, the state called Dr. Richard Ofshe to testify as an expert in the field of extreme techniques of influence and control. Ofshe is a professor of sociology who authored a book on individual decision-making, and specialized in "extreme and extraordinary techniques of influence." He had previously testified as an

7

expert twenty-five times, including in Florida. Williamson's counsel chose not to voir dire Ofshe and the judge court declared him to be an expert in that subject. Ofshe testified that Panoyan's delay in identifying Williamson displayed "a pattern of someone who has . . . been terrorized, and someone who is acting in response to a credible threat." *Williamson v. State* (*Williamson III*), 123 So. 3d 1060, 1062 (Fla. 2013) (alteration in original) (quoting *Williamson v. State* (*Williamson II*), 994 So. 2d 1000, 1009 (Fla. 2008)).

Williamson's counsel thought that the jury would recognize that the state's reliance on Ofshe demonstrated that it was "grasping at straws" to establish Panoyan's credibility. In his closing argument, he argued that the state "[f]lying in Doctor Ofshe from Los Angeles" proved that it was "try[ing] to make up in quantity what [it] lack[s] in quality. Because, quite frankly, the quality of the evidence is not all that great."

Although Panoyan was the only eyewitness who identified Williamson as the masked gunman, physical evidence and the testimony of three jailhouse informants also linked Williamson to the murder. The state proved that Williamson owned a hat that looked like the distinctive cowboy hat worn by the killer. It offered evidence that Williamson used to have pins on his hat and the hat recovered at the crime scene appeared to have pinholes. The state linked Williamson to a utility belt that contained the keys to the handcuffs used during the

8

crime. And the state proved that Williamson owned grappling-hook rope similar to the rope used to bind the Deckers. It also presented testimony from three inmates who were incarcerated with Williamson regarding "their conversations with [Williamson] in which he recounted the details of the crimes committed at the Decker house."

The jury found Williamson guilty of all charges. It recommended death by a vote of eleven to one. The judge, after finding three aggravating circumstances and eleven mitigating circumstances, imposed a death sentence. On direct appeal, the Florida Supreme Court upheld Williamson's convictions and his sentence of death. *See Williamson v. State* (*Williamson I*), 681 So. 2d 688, 694–98 (Fla. 1996).

Williamson filed a state motion for postconviction relief in in which he raised eleven claims. The trial court summarily denied all of his claims after a *Huff* hearing. *See Huff v. State*, 622 So. 2d 982 (Fla. 1993). The Florida Supreme Court vacated Williamson's convictions for attempted first-degree murder because "[o]ne of the alternative bases for these convictions was based on the crime of attempted first-degree felony murder," *Williamson II*, 994 So. 2d at 1016, and the Florida Supreme Court had determined while Williamson's appeal was pending that attempted first-degree felony murder is not a crime in Florida, *id.* (citing *State v. Gray*, 654 So. 2d 552 (Fla. 1995)). But the Florida Supreme Court did not vacate Williamson's death sentence because it was "convinced beyond a reasonable doubt

9

that the death penalty would have been imposed given the nature and extent of the remaining aggravating and mitigating circumstances." *Id*. It affirmed the denial of all of Williamson's other claims "except those issues alleging that defendant's counsel was ineffective in failing to request a *Frye* hearing before the opinion testimony of the State's expert, Dr. Robert Ofshe, was admitted into evidence." *Id.* at 1005; *see Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). The Florida Supreme Court remanded Williamson's petition for an evidentiary hearing. *Williamson II*, 994 So. 2d at 1010.

On remand, the trial court conducted an evidentiary hearing on whether Williamson's trial counsel was constitutionally deficient under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984). Williamson's trial counsel testified that he did not request a *Frye* hearing because he did not give any weight to Ofshe's testimony and did not believe that the jury would either. Indeed, Williamson's counsel argued at trial that the state's reliance on Ofshe demonstrated that it was "try[ing] to make up in quantity what [it] lack[s] in quality." The trial court ruled that Williamson's counsel was not deficient, because he "carefully considered" whether or not to voir dire Dr. Ofshe "and ultimately made the strategic decision not to question Dr. Ofshe's qualifications. . . . He cannot be found to have been ineffective simply because, with the benefit of hindsight, he would have made a different choice." His conduct was not "outside

10

the broad range of competent performance under prevailing standards" and Williamson failed to satisfy the first part of the governing test under *Strickland*.

The trial court also ruled that Williamson failed to prove that he suffered prejudice under *Strickland*. It first ruled that "Ofshe's testimony was properly introduced into evidence." And it found that "[t]he State clearly established at the evidentiary hearing that this type of testimony is based upon long-established and widely-accepted principles of sociology and psychology. [Two experts] testified that Dr. Ofshe's work is highly respected in the social science community . . . and is frequently relied upon." The trial court determined that "[t]here is no reasonable probability, sufficient to undermine [its] confidence, that Dr. Ofshe's testimony would have been excluded had defense counsel challenged Dr. Ofshe's qualifications." The trial court also ruled that "even if Dr. Ofshe's testimony were inadmissible . . . the admission of the evidence was not prejudicial." It based this decision on the fact that several witnesses confirmed Panoyan's fear and paranoid behavior, several witnesses corroborated Panoyan's identification of Williamson, and three inmates testified about Williamson's inculpatory statements.

On appeal, the Florida Supreme Court declined to address whether Williamson's counsel was deficient and ruled only that Williamson was unable to prove that he suffered prejudice from any alleged deficiency. Like the lower court, it recounted substantial evidence of Williamson's guilt:

11

> [T]he State presented evidence demonstrating that Williamson owned a hat similar to the one found following the murder at the Decker residence; evidence linking Williamson and his brother to a utility belt on which there were keys to the handcuffs used to bind Robert and Carl Decker; evidence demonstrating that Williamson had knowledge of legal forms, where the gunman during the crime had asked the Deckers to sign their names to a legal-sized piece of paper; and other circumstantial evidence.

*Williamson III*, 123 So. 3d at 1066. The Florida Supreme Court also explained that Williamson's counsel "continued to attack Panoyan's credibility [by] describing each of the conflicts in Panoyan's testimony and . . . constantly reminding the jury that Panoyan was initially thought to have been guilty of the crimes." *Id*. at 1068 (quoting *Williamson II*, 994 So. 2d at 1008). It ruled that "even assuming trial counsel's alleged deficiencies, we do not find that they have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined." *Id*.

Williamson filed a federal petition for a writ of habeas corpus in the district court. The district court lamented its "discomfort with the admission of Dr. Ofshe's testimony," but conceded that "the record simply does not show that the Florida Supreme Court's application of *Strickland*'s prejudice prong was contrary to the requirements established in *Strickland* itself." Under the deferential standard of review mandated by the Antiterrorism and Effective Death Penalty Act, the district

court concluded that "the Florida Supreme Court's factual determinations and prejudice analysis were not unreasonable," and denied habeas relief.

Without addressing whether Williamson's counsel was deficient, the district court granted a certificate of appealability because it "[found] that there is a substantial showing of a denial of a constitutional right and 'jurists of reason could disagree with the district court's resolution of his constitutional claim or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'"

## II. STANDARD OF REVIEW

We review *de novo* the denial of a petition for a writ of habeas corpus. *Bates v. Sec'y, Dep't of Corr.*, 768 F.3d 1278, 1287 (11th Cir. 2014). "Under [the Antiterrorism and Effective Death Penalty Act of 1996], a federal court may not grant habeas relief on a claim adjudicated on the merits in state court unless the state court's decision 'was contrary to, or involved an unreasonable application of, clearly established [f]ederal law, as determined by the Supreme Court of the United States,' or 'was based on an unreasonable determination of the facts in light of the evidence presented in the [s]tate court proceeding.'" *Id.* at 1287–88 (second alteration in original) (quoting 28 U.S.C. § 2254(d)). "The phrase 'clearly established federal law' refers only to 'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'" *Id.*

13

at 1288 (quoting *Williams v. Taylor*, 529 U.S. 362, 412, 120 S. Ct. 1495, 1523 (2000)). And "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Harrington v. Richter*, 562 U.S. 86, 101, 131 S. Ct. 770, 785 (2011) (quoting *Williams*, 529 U.S. at 410, 120 S. Ct. at 1522). "To obtain habeas relief 'a state prisoner must show that the state court's ruling on the claim being presented in the federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Reese v. Sec'y, Fla. Dep't of Corr.*, 675 F.3d 1277, 1286 (11th Cir. 2012) (quoting *Richter*, 562 U.S. at 103, 131 S. Ct. at 786–87).

## III. DISCUSSION

Williamson argues that the decision of the Florida Supreme Court was unreasonable. The Florida Supreme Court ruled that even had Ofshe's testimony been excluded, Williamson failed to establish that he suffered prejudice from this alleged deficiency. To establish prejudice, Williamson "has to show that every fair-minded jurist would conclude 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Jones v. GDCP Warden*, 753 F.3d 1171, 1184 (11th Cir. 2014) (quoting *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068). He "need not show that counsel's conduct more likely than not altered the outcome of his . . . proceeding;

14

'[a] reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.* (second alteration in original) (quoting *Strickland*, 466 U.S. at 694, 104 S. Ct at 2068). And "[t]he likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112, 131 S. Ct. at 792.

When the state court has weighed the evidence, a state prisoner must establish that the ruling of the state court was unreasonable—that is, it "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103, 131 S. Ct. at 786–87. "[I]f we conclude that the Supreme Court of Florida reasonably applied clearly established federal law when it decided that [the defendant] had failed to established prejudice, we may affirm the denial of [the defendant's] petition without addressing whether the performance of his counsel was deficient." *Evans v. Sec'y, Dep't of Corr.*, 703 F.3d 1316, 1326 (11th Cir. 2013) (en banc). And "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id.* (quoting *Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069).

Williamson argues that the decision of the Florida Supreme Court to deny habeas relief was contrary to *Strickland*. He argues that the Florida Supreme Court

applied an outcome-determinative test to determine if there was prejudice, rather than the correct standard under *Strickland*. This argument is meritless.

The Florida Supreme Court correctly stated the governing rule under clearly established federal law. It quoted *Strickland* and ruled that it was not "reasonably probable that the result would have been different even if Dr. Ofshe's testimony had been entirely excluded." *Williamson III*, 123 So. 3d at 1066. It held that "even assuming trial counsel's alleged deficiencies, we do not find that they have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined." *Id.* at 1068. The Florida Supreme Court applied *Strickland*'s standard of reasonable probability, not an outcome-determinative test.

Williamson also argues that the Florida court unreasonably applied *Strickland* because Panoyan's credibility was the key issue at trial and Dr. Ofshe's improper bolstering inherently undermined confidence in the verdict, but we disagree. The Florida Court assumed, without deciding, that the testimony was improper. It determined that even if Ofshe's testimony should have been excluded, its admission did not undermine confidence in the outcome. *Id.* at 1066. "The decision of a state court involves an unreasonable application of clearly established federal law if the state court identifies the correct governing legal rule but unreasonably applies it to the facts of the particular state prisoner's case, or when it unreasonably extends, or unreasonably declines to extend, a legal principle from

16

Supreme Court case law to a new context." *Reese*, 675 F.3d at 1286 (quoting *Greene v. Upton*, 644 F.3d 1145, 1154 (11th Cir. 2011). "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the United States Supreme Court]." *Id.* at 1288 (alterations in original) (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 122, 129 S. Ct. 1411, 1419 (2009)). The Supreme Court has never held that improperly allowing an expert witness to bolster the credibility of the key fact witness is inherently "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068. Nor has the Supreme Court held that any error related to the key issue at trial necessarily undermines confidence in the outcome.

Nor was the decision of the Florida Supreme Court an unreasonable determination of the facts. A fair-minded jurist could conclude that there is not a reasonable probability that the result would have been different had Ofshe's testimony been excluded. At trial, the state introduced 230 exhibits and called 47 witnesses, ten of whom corroborated Panoyan's fear of Williamson. The security guard testified that Panoyan appeared panicked and called his wife, telling her to "get the kids and get out." The first police officer to speak with Panoyan after the murder confirmed Panoyan's fearful behavior and testified that Panoyan told him, "I have to get my wife and kids. I have to get them out of the house. . . . They're

17

watching my house. They know where I live." A detective who investigated the murder testified that Panoyan was "very, very nervous." An officer who saw Panoyan shortly after the murder testified that Panoyan appeared to be "very upset and afraid." An officer who interviewed Panoyan testified that he "kept reiterating he was scared for his family." A former cellmate of Williamson testified that Panoyan was afraid of Williamson. A friend of the Williamsons described Panoyan as "emotionally upset" after the murder. A coworker testified that Panoyan recounted the events of the murder and told him that the gunman made threats that "were so horrible and horrendous, it scared him to death, and he wouldn't tell anyone what they were." The lead detective testified that Panoyan appeared paranoid and that Panoyan "had maintained that he was fearful for his safety and his family's safety from the very beginning of the investigation." And a former police officer who helped convince Panoyan to testify before a grand jury testified that Panoyan "had constant fear." Physical evidence, including a distinctive cowboy hat, a utility belt with handcuff keys that matched the handcuffs used during the murder, and grappling-hook rope linked Williamson to the crime. And three jailhouse informants recounted Williamson's inculpatory statements. The determination of the Florida Supreme Court that, absent Ofshe's testimony, the "evidence presented at trial provide[d] competent, substantial evidence of

18

[Williamson's] guilt," *Williamson III*, 123 So. 3d at 1066 (second alteration in original) (quoting *Williamson I*, 681 So. 2d at 697), was not unreasonable.

Although we affirm, we must mention that the district court did not address the issue of deficient performance before granting a certificate of appealability. "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). And the certificate must "indicate which specific issue or issues satisfy the showing." *Id.* § 2253(c)(3). For *Strickland* claims, the petitioner must make a substantial showing on both elements of the claim: that his counsel was deficient and that this deficiency prejudiced the petitioner. A judge should grant a certificate only if jurists of reason would find the merits of the underlying claim debatable under the deferential lens of the Antiterrorism and Effective Death Penalty Act. *See Muhammad v. Sec'y, Dep't of Corr.*, 554 F.3d 949, 958 (11th Cir. 2009). The district court should have considered both the debatability of whether counsel was deficient and the debatability of whether the petitioner suffered prejudice before granting a certificate of appealability. But this deficiency is not jurisdictional, and we "decline to decline to vacate the certificate at this late hour." *Spencer v. United States*, 773 F.3d 1132, 1137 (11th Cir. 2014) (en banc).

## IV. CONCLUSION

We **AFFIRM** the denial of Williamson's petition for a writ of habeas corpus.