[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-10311

_____

D.C. Docket No. 2:12-cv-00051-WBH

SCOTTY GARNELL MORROW,

Petitioner - Appellant,

versus

WARDEN, GEORGIA DIAGNOSTIC PRISON,

Respondent - Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(March 27, 2018)

Before WILSON, WILLIAM PRYOR, and NEWSOM, Circuit Judges.

WILLIAM PRYOR, Circuit Judge:

Scotty Garnell Morrow, a Georgia prisoner convicted and sentenced to death for the murders of Barbara Young and Tonya Woods, appeals the denial of his petition for a writ of habeas corpus, 28 U.S.C. § 2254. Morrow contends that we should vacate his sentence on the grounds that his trial attorneys provided ineffective assistance when they failed to uncover and introduce mitigating evidence from Morrow's childhood and when they failed to hire an independent crime-scene expert to corroborate Morrow's account of the murders. We disagree. The Supreme Court of Georgia reasonably concluded that Morrow's attorneys were not deficient for failing to uncover mitigating evidence and that the attorneys' failure to hire an independent crime-scene expert did not prejudice Morrow. We affirm.

## I.   BACKGROUND

We divide this background in four parts. We begin with the facts of the crime. Next, we explain counsel's preparations for trial. Then, we describe Morrow's trial and sentencing. We then provide an overview of the state and federal habeas proceedings.

### A.    *The Crime*

On December 29, 1994, Scotty Garnell Morrow murdered Barbara Young and Tonya Woods, and he severely injured LaToya Horne. *Humphrey v. Morrow* ("*Morrow III*"), 717 S.E.2d 168, 171–72 (Ga. 2011). Young was Morrow's

2

girlfriend, and Morrow repeatedly abused her. *Id.* at 171. On December 6 of the same year, Morrow struck Young; on December 9, he abducted, beat, and raped her twice; and on December 24, Young told a neighbor that "Morrow was going to kill her." *Id.*

On the day of the murders, Morrow and Young argued over the telephone before Morrow, armed with a handgun, went to Young's house, *id.* at 172, which was occupied by Young, Woods, Horne, and two children, *id.* at 171–72. Morrow entered the house and found the three women in the kitchen. *Id.* at 172. He argued with Woods before shooting her "in her abdomen, severing her spine and paralyzing her." *Id.* He then shot Horne in the arm. *Id.* Young fled into the bedroom, but Morrow pursued her and kicked open the bedroom door. *Id.* As they struggled, the gun discharged and "likely injur[ed]" Young. *Id.* She then ran into the hallway, but Morrow again caught her. *Id.* Forensic evidence presented by the state, *id.* at 177, suggested that Morrow "smashed her head into the bedroom's doorframe, leaving behind skin, hair, and blood," before he executed her with a single shot to the head, *id.* at 172. The bullet passed through Young's left palm, suggesting that she was "attempt[ing] to shield her head." *Id.* Morrow disputes this account and argues that "the blood and hair found on the doorframe in the hallway were deposited there by . . . Young's wounded hand, not by Morrow striking her head against the door jamb." Regardless, after Young died, Morrow returned to the

3

kitchen and either reloaded or unjammed his pistol. *Id.* He murdered Woods by shooting her in the "head at close range, and he shot . . . Horne in the face and arm." *Id.* Horne survived, but suffered permanent injuries. *Id.* Morrow then fled the scene after cutting the telephone line. *Id.*

### B.     *The Attorneys' Pretrial Preparations*

In 1995, the trial court appointed Harold Walker Jr. and William Brownell Jr. to represent Morrow, and in March of the same year a grand jury indicted Morrow for two counts of malice murder and several lesser offenses. Walker and Brownell decided to pursue mitigating evidence to support their theory that the crime was an out-of-character outburst by an otherwise "good man." They met with Morrow "almost right away" and probed "his general life history." They repeatedly discussed Morrow's childhood with Morrow's sister and mother. And they hired an investigator, Gary Mugridge, who interviewed, among others, Morrow's sister, mother, father, former girlfriend, former co-workers, and bishop. Although Mugridge lacked specific experience with capital investigations, he had 40 years of investigative experience and "literally reported everything he did back to [counsel]."

The attorneys hired two psychologists. The first, Dr. Dave Davis, interviewed Morrow about his personal and family history. Davis learned that Morrow's father "battered" his mother, that Morrow "[got] in trouble with school,"

and that Morrow had been in several "serious [romantic] relationships," "ha[d] always been heterosexual, [had] beg[u]n intercourse at age 16, and ha[d] had sexual relations with about thirty women." Davis reported that Morrow was "cooperative," that a "[g]ood rapport was established," and that Morrow was "responsive and spontaneous." The second psychologist, Dr. William Buchanan, saw Morrow four times, and the attorneys met several times with Buchanan. Buchanan testified that "Morrow was cooperative and honest" in their sessions. Morrow shared other sexual details with Buchanan, including that he "was picked up with a transvestite" in 1992 and that his son had been molested. But Morrow never told Buchanan that he had been sexually abused.

The attorneys' investigation revealed that Morrow had spent "a lot of [his] youth . . . in the New York [and] New Jersey area" before moving to the south as an older teenager. They learned that Morrow had struggled in school, had undergone psychological testing, had experienced "blackouts as a child," and had a "big brother mentor through the school." And they discovered that "Morrow's childhood life was not ideal" because "he saw his mother physically abused, saw his family members emotionally abused . . . [and] was made fun of by . . . other children."

This investigation led the attorneys to "believ[e] [they] had [found] everything" and that Morrow had not experienced sexual or extreme physical

5

abuse in the light of his and his family's statements. They also saw little reason to doubt the truthfulness and completeness of these accounts because the family offered candid responses to their questions. For example, Morrow's mother freely discussed "how her husband beat her in front of [the] children," and counsel learned that Morrow was subject to "some physical abuse" such as "intense spanking[s]." Although the attorneys found the mother "difficult in terms of providing information" and perceived that she gave "the same answers over and over again," they determined that she was honest and never "hostile or unwilling to help." And Walker later testified that he "never got the feeling [Morrow] was trying to mislead [them]."

The attorneys encountered a few "dead ends," such as when they unsuccessfully attempted to reach out to officials at Morrow's childhood school and Morrow's childhood mentor. They also declined to send Mugridge to New York and New Jersey to further explore Morrow's childhood. And the attorneys did not hire a social worker to help with the investigation because they concluded that doing so was unnecessary in the light "of what . . . Buchanan was doing and the mitigation evidence that . . . Mugridge was finding." They also did not retain a forensic expert to rebut the state investigator's forensic account of the crime.

### C.    *The Trial and Sentencing*

At trial, Morrow testified that his victims had verbally provoked the assault and gave a less-brutal description of the murders. He asserted that Woods was standing upright and taunting him when he fired the first shot. He also gave an account of his struggle with Young that conflicted with evidence presented by the state that "Young's forehead likely was injured when her head struck a doorframe." *Id.* at 177. And he disputed that he reloaded his gun mid-rampage. The prosecutor underscored the discrepancies between Morrow's testimony and the physical evidence and repeatedly accused Morrow of lying to evade responsibility.

By all accounts, Morrow was a poor witness. Walker later recalled that the "cross-examination was a disaster" because Morrow failed to show "remorse and shame" and "was as flat on the stand as [he had] ever seen him." The jury convicted Morrow on all charges.

At sentencing, trial counsel depicted Morrow as an otherwise peaceful man who "snapped" after a lifetime of "rejection" and "emotional difficulty." Morrow did not testify because he "was firm in . . . not wanting to testify again" and his attorneys thought his earlier trial testimony "was a disaster." They instead presented fourteen witnesses, including Morrow's mother and sister, who testified that Morrow had seen his father abuse his mother, that he had visited psychiatrists, that he "was a little slow in some things," that he "was picked on in school," and

that he was spanked as a child "with a strap in front of his classmates." Buchanan testified that Morrow suffered from several emotional disorders and frailties and that Morrow had "a suspicious, mistrustful[,] . . . [and] impulsive" nature. The jury recommended a sentence of death after finding five aggravating factors, including that the murders were "outrageously vile, horrible[,] or inhuman in that [they] involved torture and depravity of mind." *Morrow v. State* ("*Morrow I*"), 532 S.E.2d 78, 82 (Ga. 2000). The Supreme Court of Georgia affirmed on direct appeal, *id.* at 89, and the Supreme Court of the United States denied certiorari, *Morrow v. Georgia* ("*Morrow II*"), 532 U.S. 944 (2001).

### D.    The State and Federal Habeas Proceedings

On post-conviction review in the Superior Court of Butts County, Georgia, Morrow raised two claims for relief relevant to this appeal. First, he argued that trial counsel was ineffective for failing to uncover evidence of childhood abuse. Second, he contended that trial counsel was ineffective for failing to retain an independent crime-scene expert who would have confirmed his version of the murders and rebutted aggravating details that the prosecution highlighted.

Morrow introduced new evidence of childhood trauma that trial counsel failed to uncover. He asserted that he had been raped by an older youth who often visited Morrow's family. In support of this allegation, Morrow introduced new statements he made to a different psychologist and evidence that he began to wet

8

the bed and have behavioral problems at school around that time. And other children from Morrow's childhood, whom trial counsel had failed to interview, submitted affidavits declaring that the rapist had sexually assaulted another child. But these affidavits did not allege that Morrow had been raped.

Morrow also asserted that he was bullied and tormented by other children, and he submitted supporting affidavits from his sister and from Lemon Green Jr., a child who lived with his family. Morrow's sister asserted that Morrow "got beat up a lot by [older children]" and that Morrow was frequently bullied at school. Green recalled only that the older children "pick[ed] on" and "push[ed] . . . around" Morrow and that Morrow "took the treatment he got ok most of the time."

Morrow alleged that his mother's boyfriend frequently beat Morrow with a belt when Morrow was ten years old, and he introduced new statements from himself and his sister about these facts. He also offered new affidavits from friends and extended family members whom trial counsel had failed to interview: Morrow's aunt corroborated that Morrow reported the beatings to her, the boyfriend's son asserted that Morrow "t[old] [him] about how [the boyfriend] would beat him," and Morrow's cousin stated that the boyfriend "used to hit" Morrow.

Morrow faulted trial counsel for failing to uncover this mitigating evidence. He asserted that known "red flags," such as the domestic violence experienced by

his mother, his childhood visits to a psychologist, and his troubles in school and with bullies should have alerted counsel to the existence of more evidence. Morrow concluded that this information would have come to light had counsel obtained his school records, interviewed his childhood mentor, sent Mugridge to New York and New Jersey, and hired a social worker to help with the investigation. And Buchanan, one of the original psychologists, averred that, had he "been provided even some fraction of [the new evidence], [he] would have elicited much of the remainder of the information from . . . Morrow himself."

Morrow also presented testimony from a crime-scene expert who corroborated Morrow's marginally less gruesome account of the murders. The expert testified that Woods was standing, not sitting, when Morrow first shot her, that Morrow did not strike Young's head against a doorframe, and that Morrow did not reload his gun mid-rampage. Morrow argued that this evidence would have convinced the jury that the crime was less aggravated and that Morrow's testimony was honest.

The superior court granted relief on both claims and vacated Morrow's death sentence, but the Georgia Supreme Court reversed and reinstated the sentence. *Morrow III*, 717 S.E.2d at 171, 179. On the question of inadequate investigation, the Georgia Supreme Court determined that the attorneys were not deficient because "they reasonably relied on Morrow and his immediate family members to

10

reveal . . . information" about Morrow's past. *Id.* at 175. It underscored that "counsel met repeatedly with Morrow, his mother, and his sister, and [that] the record makes clear that counsel discussed Morrow's childhood background with [his family] extensively." *Id.* at 173. "Contrary to Morrow's argument . . . that trial counsel ignored information from the years during Morrow's childhood when he lived in New York and New Jersey," the Georgia Supreme Court ruled that counsel made reasonable inquiries about this period of Morrow's life. *Id.* It gave particular attention to the new assertion of rape and "note[d] that Morrow never reported any such rapes pre-trial to his counsel or to the mental health experts who questioned him about his background, including his sexual history." *Id.* at 176. The Georgia Supreme Court also explained that the attorneys hired an investigator, "closely monitored the investigator's progress," and "had Morrow examined by a psychiatrist" whose "report indicated a sexual history that was unremarkable, except perhaps for the fact of Morrow's promiscuity with women." *Id.* at 173. And it determined that "[c]ounsel and their investigator made reasonable attempts to contact [Morrow's childhood mentor]." *Id.* at 174.

The Georgia Supreme Court also reversed the superior court and held that the failure to uncover mitigating evidence did not prejudice Morrow because the new evidence was duplicative or unpersuasive. *Id.* at 173, 175–77. Regarding Morrow's assertion that his extended family was "unkind to him and his sister and

disciplined them harshly and that the other children in the home bullied him," it found "this new testimony to be less than compelling . . . because testimony was actually presented at trial about how Morrow had been bullied often as a child and had been punished by his mother for not standing up for himself and for misbehaving." *Id.* at 175. Regarding Morrow's assertion of rape, the Georgia Supreme Court reasoned that "recent allegations about the rapes would not have been given great weight by the jury" because the "only direct evidence . . . was [Morrow's] own statement to a psychologist." *Id.* at 176. And regarding Morrow's allegation that he was beaten by his mother's boyfriend, the Georgia Supreme Court explained that "testimony at trial . . . show[ed] that the boyfriend had been abusive to Morrow's mother and had once cruelly mocked Morrow when he attempted to defend his mother with a baseball bat." *Id.* at 176. And it pointed out that the new evidence "was somewhat inconsistent regarding the degree of harshness involved." *Id.* at 176 n.4.

The Georgia Supreme Court also held that Morrow suffered "no substantial prejudice" from counsel's failure to hire a forensic expert. *Id.* at 177. Although it acknowledged that the new "evidence . . . [that] Woods was standing rather than sitting when Morrow shot her" "would have tended at trial to confirm Morrow's version [of events]," it concluded that this information "would not have had a significant impact on the jury in light of the fact that the evidence was clear that

Morrow began shooting simply because he was upset by what [she] had said to him rather than because of any threat he sensed." *Id.* The Georgia Supreme Court also underscored that the surviving victim's testimony at trial was "consistent with Morrow's" version of events, leading it to doubt the marginal value of an additional expert account. *Id.* Regarding Morrow's contention that the expert would have testified that Young's head wound occurred not "when her head struck a doorframe during the struggle" but when a bullet "grazed her forehead," the Georgia Supreme Court determined that the jury would "favor the testimony of the State's experts" and that, "even if the jury chose to believe . . . Morrow's new expert, that version would not be significantly mitigating[] because it still depicts Morrow as having struggled with [Young] for the gun in the bedroom, chasing her as she fled into the hallway, grabbing her by her hair as she lay helpless on the floor, and shooting her in the head." *Id.* Regarding Morrow's argument that the expert would have testified that Morrow unjammed instead of reloaded his gun before executing Woods, the Georgia Supreme Court determined that "the testimony would have been essentially cumulative of similar testimony from an expert for the State" and that, "regardless of whether Morrow was clearing a jam in his gun or reloading, it is clear that he was taking active steps to prepare his gun to continue his murderous rampage." *Id.*

13

The district court denied Morrow a writ of habeas corpus, but it granted a certificate of appealability on the question of mitigating evidence. And we granted a certificate of appealability on the failure to hire an independent expert.

## II.   STANDARD OF REVIEW

"We review *de novo* the denial of a petition for a writ of habeas corpus." *Williamson v. Fla. Dep't of Corr.*, 805 F.3d 1009, 1016 (11th Cir. 2015). We may not grant relief on "any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim" either "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "When deciding that issue, we review *one decision*: 'the last state-court adjudication on the merits.'" *Wilson v. Warden, Ga. Diagnostic Prison*, 834 F.3d 1227, 1232 (11th Cir. 2016) (en banc) (emphasis added) (quoting *Greene v. Fisher*, 565 U.S. 34, 40 (2011)). This narrow evaluation is highly deferential, for "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). We also must presume that "a determination

14

of a factual issue made by a State court [is] correct," and the petitioner "ha[s] the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

## III.   DISCUSSION

Morrow raises two issues for our review. First, he argues that the Georgia Supreme Court unreasonably determined that his attorneys were not deficient for failing to uncover mitigating evidence of childhood hardships and that he suffered no prejudice. Second, he argues that the Georgia Supreme Court unreasonably determined that the attorneys' failure to retain an independent crime-scene expert did not prejudice Morrow. We consider and reject each argument in turn.

### A.   The Georgia Supreme Court Reasonably Determined that Trial Counsel Was Not Deficient for Failing To Uncover Mitigating Evidence and that Morrow Suffered No Prejudice.

When a petitioner alleges that he received ineffective assistance of trial counsel, *Strickland v. Washington*, 466 U.S. 668 (1984), he must first establish "that counsel's performance was deficient" by "showing that counsel made errors so serious that counsel was not functioning as the counsel guaranteed . . . by the Sixth Amendment . . . [and] fell below an objective standard of reasonableness." *Williams v. Taylor*, 529 U.S. 362, 390–91 (2000) (internal citations and quotation marks omitted). Counsel's failure to "conduct an adequate background investigation," *Cooper v. Sec'y, Dep't of Corr.*, 646 F.3d 1328, 1351 (11th Cir.

15

2011), or to pursue "all reasonably available mitigating evidence" can satisfy this standard, *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (emphasis omitted) (citation omitted). For example, we have identified deficient performance when counsel failed to "thoroughly question[] [the petitioner] about his childhood and background" and spoke with only one family member immediately before the sentencing stage despite knowing that the petitioner "had a bad childhood." *Johnson v. Sec'y, Dep't of Corr.*, 643 F.3d 907, 932 (11th Cir. 2011). Counsel also performs deficiently when he briefly investigates tales of abuse only to believe the abuser's "denial without checking with any other family member[s] [who are] ready, willing, and able to testify that [the petitioner is] telling the truth about his abusive upbringing." *Id.*; *see also Daniel v. Comm'r, Ala. Dep't of Corr.*, 822 F.3d 1248, 1263–64 (11th Cir. 2016) (explaining that a deficient attorney "had almost no meaningful contact with [the petitioner] or his family" and had brushed off "a series of attempts [by the petitioner's mother] to contact [counsel]"). And counsel must not overlook "evidence of . . . abuse" that "was documented extensively in [available] records." *Newland v. Hall*, 527 F.3d 1162, 1206 (11th Cir. 2008) (quoting *Callahan v. Campbell*, 427 F.3d 897, 935 (11th Cir. 2005)); *see also Rompilla v. Beard*, 545 U.S. 374, 383–84 (2005).

Nevertheless, "omissions are inevitable." *Stewart v. Sec'y, Dep't of Corr.*, 476 F.3d 1193, 1209 (11th Cir. 2007) (quoting *Chandler v. United States*, 218 F.3d

16

1305, 1313 (11th Cir. 2000) (en banc)). And "the reasonableness of a defense attorney's investigation . . . [depends] heavily [on] the information provided by the defendant" because "[c]ounsel's actions are usually based . . . on informed strategic choices made by the defendant and on information supplied by the defendant." *Newland*, 527 F.3d at 1202 (quoting *Strickland*, 466 U.S. at 691). Indeed, "when a petitioner (or family members petitioner directs his lawyer to talk to) does not mention a history of physical abuse, a lawyer is not ineffective for failing to discover or to offer evidence of abuse as mitigation." *Stewart*, 476 F.3d at 1211 (alterations adopted) (quoting *Van Poyck v. Fla. Dep't of Corr.*, 290 F.3d 1318, 1325 (11th Cir. 2002)); *see also Williams v. Head*, 185 F.3d 1223, 1237 (11th Cir. 1999) ("An attorney does not render ineffective assistance by failing to discover and develop evidence of childhood abuse that his client does not mention to him."). Counsel also need not interview every conceivable witness because "there comes a point at which evidence from more distant relatives can reasonably be expected to be only cumulative." *Bobby v. Van Hook*, 558 U.S. 4, 11 (2009); *see also id.* ("[I]t [is] not unreasonable for . . . counsel not to identify and interview every other living family member . . . ."). And even if counsel is aware of some childhood hardships, he is not automatically deficient for failing to discover other abuse that his client conceals. *See, e.g.*, *id.* at 11; *Anderson v. Sec'y, Fla. Dep't of*

17

*Corr.*, 752 F.3d 881, 906 (11th Cir. 2014); *Stewart*, 476 F.3d at 1197–98, 1211, 1215–16.

Morrow contends that his counsel failed "to learn about Morrow's life during [his] formative years" and overlooked evidence that he was raped, beaten, bullied, and mistreated as a child. He underscores that counsel "*exclusively*" relied on "[i]nterviews with Morrow, his mother[,] and his sister," failed "to obtain school records that documented, *inter alia*, Morrow's visit to a child psychiatrist," and failed to interview "Morrow's 'big brother' figure in New Jersey . . . [after] Morrow's sister could not provide a telephone number." And he contends that counsel ignored "glaring red flags," such as the abuse suffered by Morrow's mother, his troubles at school, his "personality disorder," his childhood visits to a psychologist, and evidence that he was "beat up" at school. Morrow also complains that his counsel failed to "retain a licensed clinical social worker" despite having the funds to do so.

The Georgia Supreme Court reasonably concluded that trial counsel conducted an adequate investigation. Counsel made inquiries that would have uncovered the new mitigating evidence were it not for the silence of Morrow and his family. On the issue of rape, the Georgia Supreme Court found "that Morrow never reported any such rapes pre-trial to his counsel or to the mental health experts who questioned him about his background, including his sexual history."

18

*Morrow III*, 717 S.E.2d at 176. Walker later testified that he "certainly" knew that sexual abuse "is of such [a] crucial nature to a defense that you want to move heaven and earth to go find it" and that this was "the type of question that [he was] sure [he] would have asked of [Morrow's] family or of [Morrow]." But Morrow and his family failed to mention the rape. And counsel subjected Morrow to several psychological interviews that extensively probed Morrow's family and sexual history but turned up no evidence of abuse. *Cf. Wiggins*, 539 U.S. at 523 (pointing out that deficient counsel arranged for an incomplete psychological interview that "revealed *nothing* . . . of [the] petitioner's life history" (emphasis added)).

We fail to understand what else counsel could have done to uncover the rape. Morrow and the alleged rapist are the only witnesses to the rape, and Morrow does not contend that he reported the assault, so any further inquiry would have been fruitless without Morrow's cooperation. And counsel had no reason to doubt Morrow's honesty. Morrow shared intimate details about his sexual history and even revealed that his son had been molested. Walker later testified that he "never got the feeling [Morrow] was trying to mislead [the attorneys]," and Buchanan averred that "Morrow was cooperative and honest." Morrow's "forthcoming description[]" of his personal history entitled his "attorney[s] to believe that

19

[Morrow] was not withholding any potentially mitigating circumstances." *Anderson*, 752 F.3d at 906.

The same analysis applies to the new evidence that Morrow was bullied in school and beaten by his mother's boyfriend. Counsel made reasonable inquiries about this kind of information only to meet dead ends. As the Georgia Supreme Court found, "counsel met repeatedly with Morrow, his mother, and his sister" and "discussed Morrow's childhood background with them extensively." *Morrow III*, 717 S.E.2d at 173. Indeed, the witnesses who later provided the majority of the new evidence—Morrow and his sister—were the *same witnesses* relied on by trial counsel. True, new witnesses mentioned the torment in their affidavits, but Morrow's attorneys were entitled to focus their investigation on Morrow and his immediate family because "it [is] not unreasonable for . . . counsel not to identify and interview every other living family member." *Van Hook*, 558 U.S. at 11. And counsel had little reason to suspect that Morrow and his family had failed to reveal the full details of Morrow's childhood in the light of their "forthcoming descriptions." *Anderson*, 752 F.3d at 906. Brownell later averred that Morrow's sister "offered up responses to anything [he] asked" and was open about relevant information, such as "that her father was abusive to her mother." Although Morrow's mother was more "difficult in terms of providing information," she "was never difficult in the sense of being hostile or unwilling to help." She also honestly

related instances of childhood trouble, telling the attorneys "how her husband beat her in front of her children" and that Morrow was subjected to "intense spanking[s]," including a spanking in front of his classmates. The Georgia Supreme Court was entitled to find that "trial counsel [did not] ignore[] information from the [early] years [of] Morrow's childhood." *Morrow III*, 717 S.E.2d at 173.

We also disagree with Morrow that the fragments of mitigating evidence provided by Morrow and his family were "red flags" that automatically obligated counsel to uncover every detail of Morrow's childhood. To the contrary, we have explained that counsel who knew that the petitioner had a "violent early childhood with his biological mother and her family," *Stewart*, 476 F.3d at 1197, was not deficient for failing to discover later abuse by a stepfather that the petitioner "never informed [counsel] about," *id.* at 1210; *accord id.* at 1215–16, and that "a reasonable attorney" need "not necessarily . . . assume that [a petitioner is] hiding a history of sexual abuse" based on a petitioner's reports that he "experienced '[e]xtreme [f]ears,' was '[a]ccident [p]rone,' and got '[s]ick a [l]ot'" as a child, *Anderson*, 752 F.3d at 905 (quoting Pet'r's Br. at 31–32). Morrow's pretrial evidence that revealed a history of corporal punishment, bullying, struggles in school, and abuse directed against his mother gave counsel little reason to disbelieve Morrow and his family and to conduct a scorched-earth investigation,

21

especially because Morrow's sister also stated that Morrow's life was "pretty good." *Morrow III*, 717 S.E.2d at 174. And counsel took additional steps to shore up their knowledge. Mugridge interviewed dozens of potential witnesses, and the attorneys—admittedly unsuccessfully—sought out Morrow's school records and childhood mentor. This "extensive preparation" suggests diligence. *Stewart*, 476 F.3d at 1216. Although Mugridge failed to travel to New York and New Jersey, we are not convinced that further investigation of peripheral information would have uncovered details of Morrow's childhood that came to light only by virtue of Morrow and his family's untimely willingness to "mention [the] history of . . . abuse." *Id.* at 1211 (quoting *Van Poyck*, 290 F.3d at 1325).

Morrow's complaint that counsel failed to hire a social worker fails for similar reasons. A social worker would have been of little use in the light of the primary witnesses' refusals to talk, and we have explained that a "failure to utilize a social worker [is not] per se ineffective." *Newland*, 527 F.3d at 1206. Indeed, counsel was entitled to determine that extra help was unnecessary because "of what . . . Buchanan was doing and the mitigation evidence that . . . Mugridge was finding." *See Van Hook*, 558 U.S. at 19 ("[G]iven all the evidence [counsel] unearthed from those closest to [the petitioner's] upbringing and the experts who reviewed his history, it was not unreasonable for his counsel not to identify and interview every other living family member . . . ."). Morrow underwent five

psychological interviews, and Mugridge spoke with dozens of witnesses. Morrow also fails to establish that contemporary "prevailing professional norms" in Georgia dictated hiring a social worker for capital cases. *Newland*, 527 F.3d at 1184 (quoting *Strickland*, 466 U.S. at 688).

Even if counsel performs deficiently, a petitioner also must establish that he suffered prejudice by showing "that counsel's errors were so serious as to deprive [him] of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. In circumstances where counsel failed to present mitigating evidence, the petitioner must establish "a reasonable probability that at least one juror would have struck a different balance," *Wiggins*, 539 U.S. at 537, in the light of "the totality of the [old and new] mitigation evidence . . . [and] evidence in aggravation," *Porter v. McCollum*, 558 U.S. 30, 41 (2009) (alteration adopted) (quoting *Williams*, 529 U.S. at 397–98). A petitioner cannot satisfy this burden simply by pointing to new evidence that is "weak or cumulative of the testimony presented at trial." *Ponticelli v. Sec'y, Fla. Dep't of Corr.*, 690 F.3d 1271, 1296 (11th Cir. 2012); *see also Cullen v. Pinholster*, 563 U.S. 170, 200–01 (2011) (finding "no reasonable probability that . . . additional evidence . . . would have changed the jury's verdict" when the evidence "largely duplicated the mitigation evidence at trial" and was "of questionable mitigating value").

23

Morrow argues that his new evidence of childhood trauma establishes a "reasonable probability that at least one of [the] jurors would have chosen a life sentence." He underscores that "evidence of repeated childhood sexual assault" is the kind of evidence that is likely to "move[]" a jury, and he contends that the Georgia Supreme Court unreasonably discounted his evidence of "physical, sexual[,] and emotional abuse." Morrow also argues that the Georgia Supreme Court "failed to engage with [the] complete evidentiary picture" because it failed to consider the new evidence in combination with the old mitigating evidence. We disagree.

The Georgia Supreme Court reasonably held that Morrow was not prejudiced by the alleged shortcomings in his attorneys' investigation. It began by considering the new "testimony that, when Morrow was living in [New York], his [family was] unkind to him and his sister and disciplined them harshly and that the other children in the home bullied him." *Morrow III*, 717 S.E.2d at 175. It determined that "this new testimony [was] less than compelling . . . particularly because testimony was actually presented at trial about how Morrow had been bullied often as a child and had been punished by his mother for not standing up for himself and for misbehaving." *Id.* The record establishes that the jury heard evidence that Morrow "was picked on in school" and spanked as a child, and the Georgia Supreme Court was entitled to conclude that "cumulative" evidence on

24

these points had no reasonable probability of changing Morrow's sentence. *Ponticelli*, 690 F.3d at 1296.

The Georgia Supreme Court also reasonably determined that the new "allegations about the rapes would not have been given great weight by the jury." *Morrow III*, 717 S.E.2d at 176. It pointed out "that Morrow's only direct evidence of the alleged rapes . . . was his own statement to a psychologist" and that the psychologist's testimony" carried less weight "in light of the weaker evidence upon which that testimony, in part, relied." *Id.* (alteration adopted) (quoting *Whatley v. Terry*, 668 S.E.2d 651, 659 (2008)). The Georgia Supreme Court was entitled to give less weight to secondhand testimony. True, Morrow could have personally testified about the rape. But the record establishes that Morrow did not want to testify and was a poor witness, and Walker explained that Morrow's testimony was so "disaster[ous]" at trial that counsel declined to put him on the stand again during sentencing. And Morrow offers no direct evidence of rape to bolster his allegations.

The Georgia Supreme Court also reasonably determined that Morrow's new evidence of abuse by his mother's boyfriend would not have changed the sentence. *Id.* It explained that the jury had already heard "that the boyfriend had been abusive to Morrow's mother" and that "Morrow [once] attempted to defend his mother with a baseball bat." *Id.* And it underscored "that the testimony in the

25

habeas court was somewhat inconsistent regarding the degree of harshness involved." *Id.* at 176 n.4. Morrow fails to rebut these factual findings with "clear and convincing evidence," 28 U.S.C. § 2254(e)(1), and the Georgia Supreme Court was entitled to discount new evidence that "largely duplicated the mitigation evidence at trial" and was "of questionable mitigating value." *Pinholster*, 563 U.S. at 200–01.

**B.   *The Georgia Supreme Court Reasonably Determined that Counsel's Failure To Retain an Independent Forensic Expert Did Not Prejudice Morrow.***

Morrow asserts that the Georgia Supreme Court unreasonably determined that he was not prejudiced by his counsel's failure to hire a crime-scene expert. He contends that this expert would have both "independently corroborate[d]" Morrow's slightly less vicious account of the crime and rebutted "[t]he State's theme . . . that Morrow was a self-serving liar" "who was trying to minimize his responsibility." We again disagree.

The Georgia Supreme Court reasonably determined that three pieces of supposedly new evidence were cumulative and unpersuasive. First, Morrow had asserted that "the evidence at the crime scene shows that . . . Woods was standing rather than sitting when Morrow shot her . . . [,] confirm[ing] Morrow's version of how the three victims were arranged in the room." *Morrow III*, 717 S.E.2d at 177. But the Georgia Supreme Court explained that this "new" evidence was redundant because "Horne herself testified at trial in a manner consistent with Morrow's new

26

expert testimony, as she claimed that she 'remembered [Woods] falling back in the chair.'" *Id.* (alteration adopted). Second, Morrow had contended that new evidence established that "Young's forehead likely was [not] injured when her head struck a doorframe during the struggle," but instead when a "shot . . . grazed her forehead." *Id.* But the Georgia Supreme Court determined that "the jury would . . . favor the testimony of the State's experts upon reviewing the two contrasting accounts," and it explained that "Morrow actually relied on the State's testimony showing that the injury . . . was not from a gunshot." *Id.* Third, Morrow had argued "that the clicking sound heard by [the surviving victim] and the unspent bullet on the floor . . . could have been the result of Morrow's clearing a jam in his gun rather than . . . reloading [the gun]." *Id.* But the Georgia Supreme Court reasoned that this evidence was "essentially cumulative of similar testimony from an expert for the State, which the State even highlighted in its closing argument." *Id.*

We see no reason to disturb the determination that this "cumulative" and "weak" evidence would not have influenced the jury's assessment of Morrow. *Ponticelli*, 690 F.3d at 1296. Indeed, Morrow fails to contest that the evidence was cumulative, let alone rebut the findings with "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). In the light of these findings, the Georgia Supreme Court reasonably concluded that Morrow had not suffered prejudice.

Morrow's poor performance on the stand also supports the conclusion that further corroboration was unlikely to bolster his credibility. Walker later testified that Morrow's "cross-examination was a disaster," that his "remorse and shame" did not "come through," and that "he was as flat on the stand as [Walker had] ever seen him." Walker also recalled that Morrow "apparently felt threatened[and] crossed his arms across his chest and his face turned to the hardest scowl" so that "[h]e looked precisely the way [the prosecutor] was hoping to portray him." Indeed, Morrow's poor performance influenced the attorneys' conclusion that they "couldn't risk having [Morrow testify] before the jurors again" at the penalty phase. We fail to understand how minor corroboration of peripheral details of a brutal crime would have influenced the jury's assessment of Morrow.

The Georgia Supreme Court also reasonably concluded that new forensic evidence that downplayed the brutality of the crime would have carried little weight in mitigation and that Morrow's new evidence would not have shifted "the balance of aggravating and mitigating circumstances." *Strickland*, 466 U.S. at 695. The Georgia Supreme Court explained that the dispute over whether Woods "was standing rather than sitting . . . would not have had a significant impact on the jury in light of the fact that the evidence was clear that Morrow began shooting simply because he was upset." *Morrow III*, 717 S.E.2d at 177. It also concluded that evidence that Morrow did not strike Young's head against the doorframe "would

28

not be significantly mitigating[] because it still depicts Morrow as having struggled with . . . [Young] for the gun[,] . . . chasing her . . ., grabbing her by her hair as she lay helpless . . ., and shooting her in the head." *Id.* And it reasoned that evidence that Morrow unjammed, instead of reloaded, his gun was "not . . . mitigating" because "it [was] clear [in either scenario] that he was taking active steps to prepare his gun to continue his murderous rampage." *Id.* We cannot say that the conclusion that the jury would have been unimpressed by a slightly different, but similarly brutal, version of events was unreasonable.

## IV.    CONCLUSION

We **AFFIRM** the denial of Morrow's petition for a writ of habeas corpus.

WILSON, Circuit Judge, concurring:

In light of our mandatory deference to the Supreme Court of Georgia's decision under the Antiterrorism and Effective Death Penalty Act, I concur with the result in this case.  But in my estimation, the Superior Court of Butts County's resolution of the issues presented here was far more thorough and considerate than the resolution reached by the Supreme Court of Georgia in its reversal of the Superior Court's opinion.  The Superior Court undertook a searching inquiry into Morrow's childhood, and unequivocally found that Morrow was "the victim of a series of rapes" while he was growing up in the New York area.  It in turn concluded that trial counsel's failure to conduct a proper investigation into his life there rendered their performance deficient and prejudiced the outcome of Morrow's case.  The Superior Court also found, after a careful examination into testimony and details about the crime scene, that trial counsel's failure to hire an independent crime scene expert was deficient and prejudicial to Morrow.

We should not subject a habeas petitioner to death if he has not been accorded the thorough review of an ineffective assistance of counsel claim that is contemplated under our Constitution.  See U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence.").  I fear that, in Morrow's case, the result we have reached is based on the Supreme Court of Georgia's unwillingness to grapple with

30

the intricacies of his case.  Namely, here we are faced with the short shrift trial counsel gave not only to Morrow's time in New York and New Jersey and the sexual abuse that occurred there, but also to the thought of hiring a crime scene expert that supported Morrow's version of the crimes.  It is hard to ignore that there could have been a recognizable impact on at least one member of the jury.  Therefore, I concur in the result only.